HERMETIC SEAL PRODUCTS COM-
PANY, P. R., Defendant-Appellant,

v.

UNITED STATES of America,
Plaintiff-Appellee.

Nos. 5951–5953.

United States Court of Appeals
First Circuit.

Heard June 6, 1962.

Decided Aug. 30, 1962.

Louis A. Tepper, New York City, with whom Stuart F. Cartoon, Tarrytown, N. Y., was on briefs, for appellant.

David L. Rose, Atty., Dept. of Justice, with whom William H. Orrick, Jr., Asst. Atty. Gen., Francisco A. Gil, Jr., U. S. Atty., and John G. Laughlin, Atty., Dept. of Justice, were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

Three actions under § 105(b) (3) of the Renegotiation Act of 1951, 65 Stat. 14, 50 U.S.C.A.Appendix, § 1215(b) (3), were brought on behalf of the United States in the United States District Court for the District of Puerto Rico against the appellant, a corporation organized under the laws of Puerto Rico, to recover excess profits on defense subcontracts as determined in three unilateral orders of the Renegotiation Board. In one action recovery is sought for excessive profits determined for the appellant's fiscal years ending on July 31, 1952 and on July 31, 1953; in another, recovery is sought for similar profits determined for its fiscal year ending on July 31, 1954, and in the third like recovery is sought for the year ending on July 31, 1955. In the first action the United States moved for summary judgment and to strike special defenses. The motion for judgment was denied but several defenses were stricken including the defense that the Renegotiation Act of 1951

did not apply in Puerto Rico. The actions were then consolidated and trial was had by the court of the issue whether the renegotiation claims of the United States were barred by failure to assert them in certain arrangement proceedings under Chapter XI of the Bankruptcy Act in the United States District Court for the District of New Jersey involving the appellant and affiliated corporations to be considered in detail presently.

The court below held that it did not have jurisdiction to consider the applicability of the Renegotiation Act to the appellant's business in Puerto Rico and that the claims were not discharged by the arrangement proceedings. It accordingly entered a judgment for the plaintiff in each action in the amount of each unilateral order, that is to say, in the respective amounts of $650,000, $225,000 and $100,000 with interest at 4%. The present appeals are from those judgments.

Hermetic Seal Products Company, P. R., Seal Products hereinafter, is one of a group of allied corporations with their principal places of business in Newark, New Jersey. It was organized under the laws of Puerto Rico in 1951 and since that time it has engaged in Puerto Rico in the business of manufacturing and assembling hermetically sealed glass-metal components of electronic equipment such as thermostats, crystals, relays, condensers, transformers and tubes. It did no business directly with the United States but it sold its products under contracts with firms which in turn sold both to private industry and to the United States.

Since the first case stands on a somewhat different footing from the other two, we shall now describe the cases in order.

Although the Renegotiation Act of 1951, 65 Stat. 7 et seq., in its section 105 (e) (1), as it stood at the pertinent times, 50 U.S.C.A.Appendix, § 1215(e) (1), required contractors to file financial statements with the Renegotiation Board on or before the first day of the fourth

calendar month following the close of their fiscal years, the appellant did not file its statement for its fiscal year ending July 31, 1952 until March 1953, or its statement for its fiscal year ending July 31, 1953 until February 1954. The Board commenced formal renegotiation proceedings for those years on May 5, 1953 and July 1, 1954, respectively. One Sidney A. Gutkin, a stockholder of the appellant and its former counsel represented the appellant in those proceedings. In the course of them Gutkin took the position that the Act did not apply to the appellant's contracts because they were performed in Puerto Rico by a Puerto Rican corporation. And he testified that the representative of the New York Regional Renegotiation Board with whom he negotiated agreed with him. The renegotiator to whom the matter was assigned, Mr. Summerfield, however, categorically denied that he had made any such concession, and, indeed, asserted that he had been advised by higher authority that the Act did apply in Puerto Rico and that he repeatedly so informed Gutkin. Negotiations having come to nothing the appellant and the New York Regional Board entered into an agreement on June 20, 1956, extending the time within which a determination of excessive profits for fiscal 1952 could be made to March 1, 1957. On March 21, 1956, a similar agreement was made extending the time for the determination for fiscal 1953 to July 1, 1957.

On August 8, 1956 the appellant jointly with four New Jersey corporations alleged to constitute a single economic unit because of common stock ownership and because all five corporations had substantially the same officers and the same directors, filed a petition for an arrangement under Chapter XI of the Bankruptcy Act in the United States District Court for the District of New Jersey. The petition alleged that the corporations had their principal place of business in Newark, that they were unable to pay their debts as they matured and proposed an arrangement for payment of their unsecured creditors. Pursuant to the petition the court immediately appointed a receiver who assumed management of the corporations' affairs with the aid of his counsel and accountant.

During August, September and October creditors' meetings were held which eventually resulted on November 9 in an agreement by the creditors on a plan of arrangement and on November 13, 1956, the District Court held a hearing on the plan and confirmed it.

In the meantime Gutkin, unknown to the referee, had continued to represent the appellant in the renegotiation proceedings being conducted with Summerfield for the Regional Board in New York but he never disclosed that the appellant had filed a petition for an arrangement with its creditors under Chapter XI of the Bankruptcy Act. Nor were the government's renegotiation claims for fiscal 1952 and 1953 listed by the appellant in its Statement of Affairs in the Chapter XI proceeding or disclosed by anyone on behalf of the appellant to the referee, his accountant or his counsel. Consequently notices of the creditors' meetings etc. were not sent to the Renegotiation Board. However, on October 19, 1956, one Klebanoff, a former officer and principal stockholder of the appellant, who also held some of its largest secured notes, called Mr. Summerfield for information about the renegotiation claim against the appellant and in the course of the conversation told Summerfield that the appellant and its New Jersey affiliates were in a Chapter XI proceeding. Summerfield immediately confirmed that fact by a telephone call to the office of the clerk of the district court which advised him that no date had been set for the filing of proofs of claim. On the same day the Regional Board in New York notified the Board in Washington and it promptly brought the matter to the attention of the Department of Justice which in turn promptly referred the case to the General Accounting Office for preparation of a proof of claim.

In the meantime, without making any further attempt to secure a bilateral agreement for the elimination of exces-

sive profits, the Regional Board on October 23, 1956, issued a unilateral order in the amount of $200,000 for the appellant's 1952 fiscal year and sent notice of the same by mail to the appellant's Puerto Rican address with a carbon copy to its president at his New York office. And, on November 7, 1956, the New York Regional Board issued a unilateral order determining that the appellant had received excessive profits for its fiscal year ending on July 31, 1953 in the amount of $300,000. This order was also mailed to the appellant at its address in Puerto Rico and a copy mailed to one Glickman, a stockholder officer, and secured creditor of the appellant and the one who proposed the plan of arrangement finally approved. Although it was stipulated that these notices of determinations were received by the recipients in the normal course of the mails, they were never brought to the attention of the receiver or his counsel or mentioned at the formal meeting of creditors held on November 9 at which Glickman's plan of arrangement was approved.

The appellant's 1952 and 1953 cases were transferred by the New York Regional Board to the Board in Washington for review on October 25, and November 2, 1956, respectively, and on November 13 the Board wrote to the Department of Justice and the General Accounting Office requesting the preparation and filing of preliminary and contingent proofs of claim in the Chapter XI proceeding and also requesting that objection be made to any plan of arrangement which did not provide for the claims of the United States arising under the Renegotiation Act of 1951. At this time no employee or member of the Regional Board, or the Board itself or anyone in the Department of Justice had any knowledge or notice of the fact that the creditors' meeting on November 9 had approved a plan of arrangement for the appellant or that the court had confirmed the plan on November 13. Indeed, the Board's letter of November 13 constituted the first information that anyone in the Department of Justice had of any renegotiation proceed-

ing against the appellant or that it was in an arrangement proceeding under Chapter XI. The Department of Justice at once on November 15 instructed the United States Attorney in Newark to take the steps necessary to establish the government's claims for refund of excessive profits for fiscal 1952 and 1953 in the arrangement proceeding and to object to any plan of arrangement which did not make adequate provision for the filing of claims for refunds for those years and similar claims for fiscal 1954 and 1955. But the instructions came too late, for the plan of arrangement had already been adopted by the creditors and confirmed by the court and the United States Attorney in Newark so notified the Department of Justice.

On November 29, 1956, the Renegotiation Board wrote Gutkin and the appellant that it had initiated review of the New York Regional Board's unilateral determinations of excessive profits for 1952 and 1953 and set a date in December for a conference on the matter. The date of meeting was postponed to January 1957 at Gutkin's request, and he at that time asserted that the appellant's contracts were not subject to renegotiation under the Act. In March the appellant selected new counsel to represent it in the renegotiation proceeding and he for the first time suggested that the government's claims for refund were discharged for failure to present them in the Chapter XI arrangement proceeding. The Board rejected this contention and by unilateral orders on March 25, 1957, determined that the appellant had received excessive profits of $250,000 for its fiscal year ending July 31, 1952 and $400,000 for its fiscal year ending July 31, 1953. It so notified the appellant on March 28, 1957.

The appellant made timely application to the Tax Court of the United States for review of those orders but no determination by that court has been made. It has granted the appellant's motion for a general continuance pending the disposition of this action. So much for the first action.

Although, as we have previously noted, § 105(e) (1) of the Act required contractors to file financial statements with the Board on or before the first day of the fourth calendar month following the close of the contractors' fiscal years, the appellant had not filed such statements for its fiscal years ending July 1, 1954 and July 1, 1955 at the time of the arrangement proceeding beginning in August 1956. Indeed it did not file its statements for those years until February 8, 1958. Thus the Board had no way of ascertaining the presence or absence of renegotiable business of the appellant for those years at the time of the arrangement proceeding. After its statements were filed the Board issued unilateral orders on August 10, 1959 and December 21, 1959 determining that the appellant had received excessive profits of $225,000 in fiscal 1954 and $100,000 in its fiscal 1955 respectively. The appellant did not file petitions for review of these orders in the Tax Court of the United States.

The court below, as we have already noted, struck the defense that the Renegotiation Act of 1951 did not apply to business done in Puerto Rico by a Puerto Rican corporation and consolidated the cases for hearing on the remaining issues tendered by the pleadings. These issues were the statute of limitations, which has not been advanced in this court on appeal, and the defense that the renegotiation claims of the United States were barred by failure to assert them in the Chapter XI arrangement proceeding. After trial the court below found on the testimony of one witness put on the stand by the government and the depositions of Gutkin, Summerfield and others introduced by it, that the renegotiation claims were not barred and gave judgments for the plaintiff in each action in the amount of the respective unilateral determinations. We think the judgments must be affirmed.

The pertinent language of § 108 of the present Renegotiation Act is identical with that of § 403(e) (1) of its predecessor considered by the Court in Macauley v. Waterman S. S. Corp., 327 U.S. 540, 544, 66 S.Ct. 712, 90 L.Ed. 839 (1946), in which the Court held that the language of the statute gave the Tax Court power to decide questions of the coverage of the Act because "decision as to what are and are not negotiable contracts is an essential part in determining the amount of a contractor's excessive profits." Then the Court went on to say:

"The legislative history of the Renegotiation Act, moreover, shows that Congress intended the Tax Court to have exclusive jurisdiction to decide questions of fact and law, which latter include the issue raised here of whether the contracts in question are subject to the Act. In order to grant the injunction sought the District Court would have to decide this issue in the first instance. Whether it ever can do so or not, it cannot now decide questions of coverage when the administrative agencies authorized to do so have not yet made their determination. Here, just as in the Myers case,[1] the administrative process, far from being exhausted, had hardly begun. The District Court consequently was correct in holding that it lacked jurisdiction to act."

It may perhaps be that in the above case the Court was not relying so much upon the exclusive statutory jurisdiction of the Tax Court as upon the doctrine of exhaustion of administrative remedies. But however that may be, Lichter v. United States, 334 U.S. 742, 792, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948), makes it clear that a contractor who does not resort to the Tax Court cannot question the coverage of the Act elsewhere, for in that case in an action like the one at bar the Court held that contractors " * * * do not have the right to present questions as to the coverage of that Act, as to the amount of excessive profits

1. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).

adjudged to be due from them or as to other comparable issues which might have been presented by them to the Tax Court upon a timely petition to that court for a redetermination of excessive profits, if any." The question of coverage, therefore, can not be raised at all in the second and third actions. In the first action, however, a different situation obtains, for it covers excess profits for the fiscal years 1952 and 1953 as to which the appellant sought review in the Tax Court where the issue of coverage is still pending.

■ In this situation the court below in the first action, had it been asked, might well have followed the approach taken in General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940), and stayed its hand pending final determination of the question of coverage, for the validity of its judgment in that action hinges upon the answer to that question. If the Act does not apply to Puerto Rican business done by a Puerto Rican corporation the action should be dismissed. But if it does apply the judgment therein should be affirmed as will presently appear. We shall direct that the judgment in the first action be held in abeyance pending final decision of the question of coverage and proceed to consideration of the other issue in the cases.

In its order denying the appellant's motion to dismiss the actions the court said:

"I am satisfied that the Renegotiation Board, an agency of the United States, did not have actual knowledge of the proceedings in bankruptcy, that the defendant indeed, not only failed to mention the claim of the Board in its schedules, but deliberately concealed the bankruptcy proceedings from the Board, despite conferences with officials of the Board during the course of the proceedings; and that the provisions of Title 11 U.S.C.A., Sec. 94(e), relating to notice of the first meeting of creditors to the particular government agency involved were not complied with. Therefore, the unscheduled renegotiation claims of the United States were not discharged by defendant's Chapter XI Proceedings."

And in a subsequent memorandum denying the appellant's motion for reconsideration the court added, 198 F.Supp. 749, 750:

"There is no doubt in my mind that the Renegotiation Board, as distinguished from other departments or agencies of the government, received no notice of the first meeting of creditors as required by Title 11 U.S.C.A. § 94 sub. e. As for actual knowledge of the bankruptcy proceedings, the record here does not meet the criterion of Birkett v. Columbia Bank, 195 U.S. 345, at page 350, 25 S.Ct. 38, at page 40, 49 L. Ed. 231, * * *."

Certainly the appellant's officers knew that there were renegotiation claims of the United States pending when they initiated the arrangement proceeding. And § 58 of Chapter VI of the Bankruptcy Act, 11 U.S.C.A. § 94, sub. e provides:

"Whenever the schedules of the bankrupt, or the list of creditors of the bankrupt, or any other papers filed in the case disclose a debt to the United States acting through any department, agency, or instrumentality thereof, * * * a notice of the first meeting shall be mailed as well to the head of such department, agency, or instrumentality."

■ Although this section literally applies only to scheduled or listed debts and imposes a duty on the bankruptcy court rather than upon the bankrupt, we do not read it so narrowly as to permit a bankrupt to escape its requirement of notice by deliberately failing to schedule or list a debt to the United States. Cf., United States v. Golenburg, 175 F.Supp. 415 (N.D.Ohio, 1959). The thrust of the statute is not to be so easily avoided. And the Renegotiation Board is the particular governmental agency or instrumentality primarily concerned. Yet

there is no suggestion that the appellant ever gave the Renegotiation Board any notice of any kind of the arrangement proceeding in which it was involved.[2] Indeed our rather detailed statement of facts as drawn from the stipulation of the parties, the testimony of the one witness who took the stand and the depositions submitted shows that there is ample evidentiary basis for the court's finding that the appellant's responsible officials deliberately concealed the arrangement proceeding from the Renegotiation Board. The court's findings of lack of notice and in fact of deliberate concealment are certainly not "clearly erroneous."

■ Nor did the court below err in its rulings of law.

Section 367 of Chapter 11 of the Bankruptcy Act, 11 U.S.C.A. § 767, provides in material part that " * * * the arrangement and its provisions shall be binding on the debtor, * * * and upon all creditors of the debtor, whether or not they are affected by the arrangement or have accepted it or have filed their claims, and whether or not their claims have been scheduled or allowed and are allowable; * * *." But this provision is qualified by § 371 of Chapter XI, 11 U.S.C.A. § 771 which provides: "The confirmation of an arrangement shall discharge a debtor from all his unsecured debts and liabilities provided for by the arrangement * * * but excluding such debts as, under section 35 of this title, are not dischargeable." And § 17 of Chapter III of the Bankrutpcy Act, 11 U.S.C.A. § 35 provides, with emphasis supplied: "A discharge in bankruptcy shall release a bankrupt from all of his provable debts * * * except such as * * * have not been duly scheduled in time for proof and allowance, with the name of the creditor if known to the bankrupt, *unless such creditor had notice* *or actual knowledge of the proceedings in bankruptcy; * * *."*

This statutory provision is not new. It was considered years ago in Birkett v. Columbia Bank, 195 U.S. 345, 350, 25 S.Ct. 38, 49 L.Ed. 231 (1904), and the relevant rule under it established as follows:

"Actual knowledge of the proceedings contemplated by the section is a knowledge in time to avail a creditor of the benefits of the law—in time to give him an equal opportunity with other creditors—not a knowledge that may come so late as to deprive him of participation in the administration of the affairs of the estate or to deprive him of dividends".

This rule has been consistently applied over the years as many cases which might be cited abundantly testify. The critical question, therefore, is whether the United States through the Renegotiation Board had knowledge of the arrangement proceeding in time to afford it an equal opportunity to participate in that proceeding with other creditors. This is the legal test applied by the court below. The question is whether it applied the test correctly to the facts. We hold that it did.

■■ The question of actual timely knowledge of bankruptcy proceedings is clearly one of fact, and the parties agree that the first actual knowledge the Renegotiation Board received of the arrangement proceeding came on October 19, 1956, over two months after that proceeding was initiated and during which time several important creditors' meetings had been held,[3] and only about three weeks before the arrangement was confirmed. And once the Board had knowledge it acted as promptly as could be expected of a large governmental agency. The facts do not require a finding of

2. The fact that the Department of the Navy had notice of a wholly separate renegotiation claim against one of the other corporations involved in the arrangement proceeding is quite beside the point.

3. Five creditors' meetings were held at which a committee was chosen, continuation of the business voted and plans discussed.

undue delay. It will suffice to say that our statement of the facts shows that the court's ultimate or operative finding that the Board as the governmental agency primarily concerned did not have knowledge of the arrangement proceeding in time to give it an equal opportunity to participate therein with other creditors is not by any means "clearly erroneous."

Judgment will be entered in No. 5951 staying the judgment of the District Court until final determination of the question of the coverage of the Renegotiation Act of 1951, as amended.

Judgment will be entered in Nos. 5952 and 5953 affirming the judgments of the District Court.