**SANDNES' SONS, INC.**

v.

**The UNITED STATES.**

**No. 800–71.**

United States Court of Claims.

July 14, 1972.

---

Numa L. Smith, Jr., Washington, D. C., Atty. of record for plaintiff; Barron K. Grier, Gary G. Quintiere and Miller & Chevalier, Washington, D. C., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

ON DEFENDANT'S MOTION FOR DEFAULT JUDGMENT AND/OR FOR A JUDGMENT IN AID OF EXECUTION OF THE RENEGOTIATION ORDER OF AUGUST 4, 1971

NICHOLS, Judge.

This case is a petition for a redetermination of excessive profits under Section 108 of the Renegotiation Act of 1951, 50 U.S.C. App. § 1218, as amended by P.L. 92–41, 85 Stat. 97 (1971). Petitioner, a closely held corporation, during its fiscal year ended May 31, 1967, had manufactured and sold wire rope assemblies and fittings, nylon cargo nets, sling cargo nets and cargo sets. Its renegotiable sales, according to the petition, were $3,875,535 and its renegotiable net profit was $417,969, of which the Renegotiation Board determined that $125,000 was excessive. Plaintiff has not paid the refund and has not filed a bond to stay the execution of the Board's order. It says it is unable to do so because it is insolvent and in bankruptcy. It is said a bank has seized all its assets. Defendant would have us default the plaintiff, or, in the alternative, enter a judgment in aid of execution of the Board's order. Plaintiff says that each alternative, if adopted, would effect an unconstitutional denial of due process of law.

The statute cited above does not prescribe any consequence of not filing a bond except that execution of the Board's order is not stayed. The seminal Renegotiation Act of 1943 (Section 701(b) of the Revenue Act of 1943, P.L. No. 78–235, 58 Stat. 21, approved February 25, 1944) expressly provided that the filing

of a petition for redetermination (then in the Tax Court):

shall not operate to stay the execution of the order of the Board * * * (Sec. 701(e) (1)).

Upon making an agreement or entering an order the Board was to direct the service Secretaries to eliminate excessive profits by withholding from amounts otherwise due the contractor, or by action in the "appropriate courts of the United States" (Sec. 701(c) (2) (E)). The Tax Court was not an "appropriate court" and Government suits were always in the District Courts. When an order was appropriately enforceable as a counterclaim, the Court of Claims was also an "appropriate court." Frantz Equipment Co. v. United States, 122 Ct.Cl. 622, 105 F. Supp. 490 (1952). It seems clear that "redetermination" and "collection" were wholly separate and distinct legal operations, neither one having anything to do with the other, the no-stay language barring any stay. United States v. Shanaman, 123 F.Supp. 402 (E.D.Pa.1954). Courts sometimes balked at or complained of the ignominious role assigned them, of summarily enforcing administrative orders, on whose validity they were not allowed to pass. United States v. Miller, 111 F.Supp. 368 (E.D.Mich.1953); Marie & Alex Manoogian Fund v. United States, 212 F.2d 369 (6th Cir. 1954); United States v. Hopkins, 95 F.Supp. 14 (N.D. Ohio 1950); United States v. Clark, 72 F.Supp. 393 (D. Oregon 1947). At times bonds were accepted to stay collection. Barton, Renegotiation of Government Contracts 166 (1952) but we believe this was done by administrative fiat, not judicial. Of course, the problem did not arise in the case of a contractor who eliminated excessive profits by agreement instead of by order, because his agreement could provide for extended terms of payment if needed.

The 1951 Act, as first passed (Act of March 23, 1951, 65 Stat. 7, 50 U.S.C. App. § 1211 and ff), in most respects paralleling that of 1943, eliminated the no-stay language and instead provided that:

* * * The filing of a petition under this section shall operate to stay the execution of the order of the Board * * * if within ten days after the filing of the petition with the Tax Court (now Court of Claims) a good and sufficient bond * * * Section 108(b).

Thus the law provided a clear cut authorized way of obtaining a stay, i. e., by filing a bond. In view of the repeal of the no-stay language, there might be some ambiguity whether the language excluded obtaining a stay in any other way, or for any other reason. This question is now academic, as will appear. Characteristic features of the 1943 Act, again reverted to, are the total separation of the redetermination and collection functions, the court assigned the former having no say about collection, and the latter, none as to the scope and coverage of the Act, nor the validity of proceedings purportedly conducted thereunder, nor even, apparently, the right to grant a stay pending Tax Court determination of such matters, absent a bond. In Hermetic Seal Products Co., P. R. v. United States, 307 F.2d 809 (1st Cir. 1962), a case involving, as here, a bankrupt contractor, the First Circuit did grant a stay pending a Tax Court determination whether the Renegotiation Act of 1951 applied to the contracts involved, which were performed in Puerto Rico. At 309 F.2d 482 (1962), cert. denied, 371 U.S. 954, 83 S.Ct. 510, 9 L.Ed.2d 501 (1963), the stay was vacated on account of the failure to furnish a bond.

■■ Public Law 92–41 makes us the redetermining court, and as we are also a collecting court by way of offset, 28 U.S.C. § 1503 or counterclaim, 28 U.S.C. § 2508, the two functions are for the first time united. Still, without any clear indication that the position of the parties respecting collection is altered, no change would be implied. We are inclined to the view that upon the filing of a petition here, and non-filing of a bond, the Government's claim for assistance of a court in "execution" of the

Board's order is a compulsory counterclaim under our Rule 40(a). Plaintiff argues that the language respecting judgment on counterclaims in 28 U.S.C. § 2508—

> If upon the whole case it [the court] finds that the plaintiff is indebted to the United States it shall render judgment to that effect, and such judgment shall be final and reviewable.

means that we cannot render judgment on a counterclaim while the claim in chief is undecided, and that the defendant's motion is, in effect, a counterclaim, by whatever name called. This general language, however, enacted long before we had renegotiation jurisdiction, must yield to specific language enacted especially for renegotiation cases. There is another significant though little noticed change in P.L. 92–41. The statute now reads in part:

> * * * The filing of a petition under this section shall operate to stay the execution of the order of the Board * * * *only* if within ten days after the filing of the petition the petitioner files with the Court of Claims a good and sufficient bond * * *

The emphasis is supplied, and the word *only* is new, having been added by the Act of August 1, 1956, ch. 821, § 11(a), 70 Stat. 791. The committee report, S. Rep. No. 2624, at 3 U.S.C.Cong. & Adm. News pp. 3823, 3833 (1956), calls attention to it. It is free from ambiguity and can only mean that the Government normally is entitled to our assistance in executing the order of the Board at once upon the filing of a petition without a bond. We reject, however, the motion to default the petitioner, because the statutory scheme has never made payment or the furnishing of security in any way a precondition for a redetermination of excessive profits, either expressly or by necessary implication. It has simply meant the Government remains free to collect in any way it is authorized to use, while the redetermination is pending, absent the bond.

Thus we turn to the constitutional issue, and if plaintiff is right we must either hold the statute unconstitutional in part or give it an interpretation, to avoid the constitutional questions, that otherwise we would probably reject.

 Plaintiff calls our attention to the undenied fact that there purports to be no due process in renegotiation cases before the "redetermination" formerly in the Tax Court, now in this. Lichter v. United States, 334 U.S. 742, 791–792, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); Lykes Bros. Steamship Co. v. United States, 459 F.2d 1393, 198 Ct.Cl. —— (decided May 12, 1972). It also invites us to consider the growing hostility in the Supreme Court towards schemes to collect first, litigate later, on due process grounds. Cases are: Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), (garnishment of wages at commencement of law suit); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), (taking person off welfare without notice and hearing); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), (lifting driver's license summarily on happening of an auto accident); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), (replevin of chattels after installment sales). In Swarb v. Lennox, 314 F.Supp. 1091 (E.D.Pa.1970), a three-judge district court struck down on due process grounds the Pennsylvania cognovit note system with respect to makers earning under $10,000. The affirmance, 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972), is on such limited grounds as not to be helpful here. D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), upholds as valid an Ohio cognovit note entered into by a corporation after arm's-length bargaining. At p. 186, 92 S.Ct. at 782 the Court says:

> * * * The Overmyer-Frick agreement, from the start, was not a contract of adhesion. There was no refusal on Frick's part to deal with Overmyer unless Overmyer agreed to a cognovit. * * *

In Fuentes v. Shevin, *supra,* the Court again limits *Overmyer* to a true arm's-length bargain. Since Government contracts are contracts of adhesion, and since the Government refuses to deal with contractors who would reject the Renegotiation Article, it is clear the issue is not foreclosed by defendant's argument that plaintiff voluntarily entered into renegotiable contracts and must accept all their implications, even unto final determination of excessive profits without any due process. There is a presumption against waiver of constitutional rights. Brookhart v. Janis, 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

To argue, as the dissent does, that the plaintiff voluntarily entered into contractual relations with the United States, is untenable. The record reflects that plaintiff's renegotiable business consisted of both contracts and subcontracts, the percentage of each being unstated. So far as concerns the subcontracts at least, it is mere fiction to say plaintiff knowingly entered into any kind of contract privity with the United States. The Board's Regulations, 32 C.F.R. § 1456.1 and ff. (January 1, 1972, Revision) reflect that a subcontractor will often be wholly unaware of the extent of its renegotiable business, even as an overall figure, still less able to tell whether any individual sale is renegotiable. The Regulations give elaborate instructions how the subcontractor is to collect data for its report to the Board. By § 1456.3, the first thing it is to do is to inquire of its customers regarding the use to which they put supplies or services furnished by the subcontractor. The warning is given that the absence of a renegotiable article or notice in a purchase order can in no way be relied on. More surprisingly, it goes on that the presence of one cannot be relied on either. Renegotiation is in fact, as this Regulation sufficiently shows, a dragnet to which the volition of the caught fish is the least of concerns. With a voluntary adhesion a matter of such immateriality to the statutory scheme, it

seems irrelevant to the constitutional issue even if, in some individual instances, all the renegotiated contracts had Renegotiation Articles or notices, reflecting actual consent. *Cf.,* Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed. 797 (1968).

We see no disposition on the part of courts to question collect now, litigate later techniques when employed to safeguard the revenues of governments. They were upheld in that context in Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931), a case mentioned and distinguished in Fuentes v. Shevin, *supra,* wherein the Court expressly excludes revenue collection procedures from the scope of its decision. 407 U.S. 67, 92 S.Ct. 1983. Thus an importer can obtain access to the Customs Court, which has exclusive jurisdiction of customs cases, only by paying the duties assessed. 28 U.S.C. § 1582, as amended. The Second Circuit has recently refused to interfere with this scheme by way of injunctive or declaratory relief, though it was alleged that the Treasury was threatening to assess dumping duties without employing due process in arriving at its fact findings. J. C. Penney Co. v. United States Treasury Department, 439 F.2d 63 (2d Cir. 1971), cert. denied, 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971). Dumping duties under 19 U.S.C. § 160 et seq. are, it may be added, highly punitive, to the degree no one incurs them voluntarily. Compare also the Internal Revenue Code provisions for levy and distraint of property, IRC § 6331, and jeopardy assessments, § 6861. These powers may be exercised without any due process determination of liability, and perhaps entirely without legal warrant, and may cause a taxpayer injury, for which there is no apparent redress. *Cf.,* David v. Cohen, 132 U.S.App.D.C. 333, 407 F.2d 1268 (1969).

However, it does not dispose of plaintiff's constitutional argument to say it might be treated in a still more arbitrary fashion if the contest here related to a

tax. The Renegotiation Act of 1951 is not a revenue measure, at least not primarily, though it is true the Renegotiation Act of 1943 was part of the Revenue Act of that year, and it is also true that Renegotiation legislation has always been the province of the House Ways and Means and Senate Finance committees—some clue as to how Congress classifies Renegotiation. Yet the statutory declaration of policy, 50 U.S.C. App. § 1211, never says the purpose of the law is revenue. If the Commissioners of Internal Revenue or Customs could determine without any due process that a person had made too much money, in their judgment, and create a legal obligation to pay money, enforceable without further ado, we think the issue of due process would bulk larger than it does under our tax and customs legislation as it actually is.

We need not analyze in detail the bearing of all these cases. They present no difficulty in reconciling the requirement that a solvent petitioner furnish a bond, if collection is to be stayed. The Supreme Court considered an appeal bond requirement for landlord and tenant litigation in Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), and struck it down as a denial of equal protection, but only because the double bond required of appealing tenants, but not others, was needlessly onerous. If collection could be stayed without a bond, frivolous appeals in renegotiation cases might delay for years the final elimination of excessive profits.

The plaintiff here says it is unable to furnish a bond, and we may take judicial notice that indigent corporations, such as plaintiff's counsel says plaintiff is, often do suffer from this disability. Therefore, plaintiff is unable to obtain a stay in the statutory manner and is exposed to the pure, unmitigated, collect now, litigate later, technique, that prevailed, at least facially, under the 1943 Act.

■ Several of the cases cited show the Supreme Court has strongly in mind the difficulty of the indigent in obtaining due process in any meaningful way, after the immediate subject matter of the dispute is taken from them. Thus the requirements of constitutional due process may be different for indigent and solvent natural persons (Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)), and for indigent and solvent corporations also. *See*, S. O. U. P., *Inc. v.' F. T. C.*, 146 U.S.App.D.C. 66, 449 F.2d 1142 (1971). (Dissent by Bazelon, C. J.)

That an indigent corporation is the subject of an excessive profits determination may seem anomalous, but we doubt if it is a mere sport case. One clue how it can come about is given in the Congressional Report on P.L. 92–41, 1 U.S.Code Cong. & Adm.News, pp. 1131, 1133 (1971), where the Board and this Court are urged to make more use, henceforward, of existing techniques for consideration of costs, expenses, and losses in other years, in determining excessive profits for a single fiscal year under review. *Cf.*, Nichols, Equalizing Profit and Loss in Renegotiation, 45 Va. L.Rev. 41 (1959). The problem will be with us and we cannot expect that, if we ignore it, it will go away.

■ Defendant wishes to default the plaintiff and thereby deny it any due process hearing on the merits. This it cannot do. Its motives in alternatively seeking a judgment in aid of execution of the Board's order can only be surmised. It certainly seems possible that such a judgment might be used to destroy the capacity of an indigent corporation to litigate further. This, in our opinion, would be an unconstitutional result, and the statute must be construed to avoid bringing it about. It is also possible, perhaps even likely, that the proposed judgment would be a mere piece of paper, without substantial effect on further proceedings. It is not suggested what the judgment would add to the Board's order with respect to proving the Government's claim in the bankruptcy. *Cf.* In re Pacific Automation Products, Inc., 224 F.Supp. 995 (S.D.Cal.1964). If the bankruptcy court really understood

the situation, it would add nothing. We are perfectly willing for defendant to have its judgment nevertheless, so long as it is not used to chill proceedings on the merits in this court.

For an informed and reasoned decision, we need facts we do not have. Therefore, while denying defendant's motion to default, we are suspending decision on the other part of the motion. The plaintiff may apply to our commissioner, who shall inquire:

a. Whether plaintiff is unable to post a bond, in light of its own financial condition and that of other persons, if any, who might benefit from a favorable outcome in this court.

b. Whether plaintiff's financial condition is due in any part to dividends or other distributions made from the notice of commencement of renegotiation, to now.

c. Whether the proposed judgment would serve any purpose, and how defendant will use it, if issued.

d. Whether the proposed judgment would in any way chill the further prosecution of plaintiff's case in this court.

e. Whether the plaintiff intends to prosecute this case on the merits and would do so if not prevented.

If plaintiff fails to apply, the commissioner shall so report, and the judgment will be entered. If plaintiff does apply, the commissioner shall report to the court his findings and conclusions on the above matters, separately from and prior to the merits, and the court will then act upon the unacted on part of defendant's motion.

In view of the foregoing, defendant's motion for default judgment is denied and decision on the alternative motion is suspended pending further proceedings in conformity with this opinion.

COWEN, Chief Judge (concurring in part and dissenting in part):

I agree with the majority that the redetermination proceeding and the collection proceeding are, as before, separate and independent legal actions which may now be pursued in one court; that this court is an appropriate forum for rendition of judgment in favor of the defendant on its counterclaim for the amount of excess profits determined by the Renegotiation Board; and that the defendant's request for assistance in "execution" of the order of the Renegotiation Board, when the plaintiff files a petition here for redetermination but does not file a bond, is a compulsory counterclaim under Rule 40(a). I also agree with the majority's reading of Section 108(b) of the Renegotiation Act, as amended, that it requires this court to grant immediate judgment in favor of the defendant in the amount stated in the Board order when the plaintiff has failed to file a bond and the defendant requests such relief.

However, I dissent from the decision of the majority holding that the plaintiff has raised a constitutional question sufficient to justify the denial of the entry of judgment on the defendant's counterclaim pending a remand of the case to the trial commissioner for the finding of further facts. Plaintiff has presented only one substantial argument to justify deferment of judgment: that the summary collection proceeding prior to the de novo redetermination of excess profits constitutes a denial of fifth amendment due process. As I see it, nothing will be gained by avoiding the only issue before us; the sole result of the majority decision will be delay. Such a result is at variance with the clear intention of Congress that excessive profits on Government contracts should be expeditiously recovered, consistent with the protection of the interests of the contractors subject to renegotiation. Following a determination of excess profits by the Renegotiation Board, the Act provides for immediate recovery of the excess profits either through administrative procedures available to the Government, for example withholding from a contractor amounts otherwise due to him (Section 105(b)(1)), or through an action for recovery

in an appropriate court (Section 105(b) (3)). The plaintiff is entitled to a full judicial redetermination of excess profits by filing a petition in this court, but the statutory language is clear:

> * * * The filing of a petition under this section shall operate to stay the execution of the order of the Board * * * *only* if within ten days after the filing of the petition the petitioner files with the Court of Claims a good and sufficient bond * * * (Section 108(b)). [Emphasis added.]

It must be stressed that the redetermination proceeding is not merely a judicial review of the Board proceeding, and no presumption of correctness attaches to the Board order. The proceeding in this court is a full de novo proceeding, and the burden of establishing excess profits is on the defendant. Lykes Bros. Steamship Co. v. United States, 459 F.2d 1393, 198 Ct.Cl. — (1972). If in the de novo trial in this court, we determine that the contractor realized less excessive profits than the amount found by the Renegotiation Board, the contractor will be entitled to recover any amount collected by the Government that exceeds our determination, plus interest. Section 105(b) of the Act. 50 U.S.C.A. Appendix § 1215 (b). It is my view, elaborated below, that this statutory plan, effectuating a substantial governmental interest, fully comports with the demands of due process, and that the contrary assertions of the plaintiff are without merit.

Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) and similar cases relied on by the plaintiff are not relevant in the situation presented here. *Fuentes* involved the relationships of private individuals; no governmental or public interests were at stake. The statutes there under consideration permitted one party to deprive the other of property without any notice or hearing. Similar considerations were involved in Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Even in cases such as Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), in which governmental involvement was more direct, the focus of concern was the deprivation of substantial and important governmental benefits without prior hearing. The thread running through all these cases is the hardship summary action works upon indigent individuals who have difficulty securing adequate legal redress of their rights, and are often in ignorance of their rights.

This case is entirely distinguishable from those noted above. The plaintiff, a corporation, has been fully aware of the Renegotiation proceedings at very stage; it was a participant in the proceeding before the Board, although that proceeding admittedly did not provide adequate due process safeguards. Plaintiff, by filing a petition in this court, has initiated a proceeding which will fully protect its interests. The most important consideration, and one which the plaintiff has failed to meet, is that it became subject to renegotiation only because it voluntarily entered into contractual relationships with the United States. That its contracts would be subject to renegotiation was expressly stated in the contracts; it is inarguable that the plaintiff is chargeable with knowledge of the terms of its contracts and the statutes and regulations governing Federal procurement. Even if the renegotiation clause had inadvertently been omitted from the contract, the terms of the Act would still have been binding. G. L. Christian & Associates v. United States, 320 F.2d 345, 350, 160 Ct.Cl. 58, 66, (1963), cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). In that case we stated:

> * * * Obligatory Congressional enactments are held to govern federal contracts because there is a need to guard the dominant legislative policy against *ad hoc* encroachment or dispensation by the executive (see, *e. g.,* United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961)). * * *

Like other individuals who deal with the Federal Government (see, *e. g.,* Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)), potential contractors can validly be bound to discover the published directives telling them the limits and the scope of the agreements the Government can make. * * * (320 F.2d at 351, 160 Ct.Cl. at 67.)

Plaintiff was fully cognizant, or should have been, prior to entering into its contracts, that it would be subject to the Renegotiation Act, and to all the provisions thereof. Nonetheless, plaintiff chose to enter into its contracts with the United States, and it has derived substantial benefits from them. It is undisputed that plaintiff earned substantial profits from its contracts; the only question is whether any portion was excessive. To characterize these contracts as "contracts of adhesion," because all the terms were prepared by the Government and because the contractor had no opportunity to object to the renegotiation provision, does not help the plaintiff or add anything to its case. The plaintiff was under no obligation to do business with the Government; it did so voluntarily, presumably because it considered it to its advantage to do so. There is nothing unfair or unjust in holding the plaintiff to its agreement. *See* Slawson, Standard Form Contracts and Democratic Control of Lawmaking Power, 84 Harv.L.Rev. 529, 549–53 (1971). Assuming arguendo that the collection-before-hearing provisions at issue do not comport with due process, plaintiff voluntarily, knowingly, and intelligently agreed that after issuance of the order of the Renegotiation Board the excess profits therein determined would be immediately collectible unless plaintiff filed a timely petition in this court and an adequate bond. See, D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 185–187, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), wherein the Court reaffirmed the well-established principal that "[t]he due process rights to notice and hearing prior to a civil judgment are subject to waiver. * * "

(*Id.* at 185, 92 S.Ct. at 782.) That case, dealing with a cognovit note between two corporations, concerned a waiver of any notice and due process hearing, while this case involves only the particular stage at which the plaintiff will get its full judicial hearing. Also presenting a useful analogy to the present issue is Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). In that case, the Federal Home Loan Bank Commissioner had, under a provision of the Home Owners' Loan Act of 1933, appointed a conservator to take possession of a savings and loan association, on grounds of mismanagement. The plaintiff association had had no notice or hearing prior to the appointment. The Court, considering the important public interest involved, held that due process was not denied by delaying the time of the hearing. Significantly, the Court stated that even assuming that the procedures were defective, the association had, by accepting and receiving benefits under a Federal charter, subject to the terms of the act, waived the right to challenge on constitutional grounds a provision thereof.

* * * The present management obtained a charter which provided that the Association "shall at all times be subject to the [provisions of the] * * * Act * * * and to any amendments thereof, and to any valid rules and regulations made thereunder as the same may be amended from time to time," * * *.

* * * It is an elementary rule of constitutional law that one may not "retain the benefits of the Act while attacking the constitutionality of one of its important conditions." United States v. City and County of San Francisco, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050. As formulated by Mr. Justice Brandeis, concurring in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688, "The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits." (*Id.* at 255, 67 S.Ct. at 1557.)

At the least, the present plaintiff has waived the right to challenge, on due process grounds, the renegotiation procdures referenced in its contracts, voluntarily executed by plaintiff, especially where the provision is imposed on all such contracts by an act of Congress in furtherance of an important governmental policy. As previously stressed, plaintiff's interests will be fully protected in the proceedings before this court.

The Supreme Court has repeatedly approved of reasonable statutory provisions permitting governmental action prior to a hearing where an important governmental or public interest is involved. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, *supra*; Yakus v. United States, 321 U.S. 414, 441, 64 S.Ct. 660, 88 L.Ed. 834 (1944). See also, Cafeteria & Restaurant Workers Union etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); Fahey v. Mallonee, *supra;* and Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944). With particular relevance for this case, the Court has approved collection prior to hearing in cases involving protection of the public revenues. E. g., Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931). While this case does not involve the internal revenue law, the 1943 Renegotiation Act was, as the majority notes, part of the Revenue Act of that year, and the renegotiation law is analogous to the revenue laws in that elimination of excessive profits from Government contracts is a measure designed to safeguard the public treasury. Congress has made clear its intention that the defense of the United States should be secured at a fair price. Section 101 of the Renegotiation Act of 1951, the "Congressional declaration of policy," states:

It is recognized and declared that the Congress has made available for the execution of the national defense program extensive funds, by appropriation and otherwise, for the procurement of property, processes, and services, and the construction of facilities necessary for the national defense; that sound execution of the national defense program requires the elimination of excessive profits from contracts made with the United States, and from related subcontracts, in the course of said program; and that the considered policy of the Congress, in the interests of the national defense and the general welfare of the Nation, requires that such excessive profits be eliminated as provided in this title * * *.

The importance of the renegotiation program is further illustrated in the Hearing Before a Subcommittee on Renegotiation Board Operations of the House Committee on Government Operations. 92d Cong., 1st Sess., pt. 2, at 15–18 (1971), wherein is inserted in the record an article by Lawrence E. Hartwig, then Chairman of the Renegotiation Board, containing, *inter alia*, the following comments:

On March 7, 1955, at a time when defense procurement was sharply reduced after Korea, President Eisenhower recommended the extension of the Renegotiation Act of 1951 and stated: "I make this recommendation because I believe the welfare of the country requires it." Eleven years later, at the peak of the Vietnam buildup, President Johnson commented on signing yet another extension of the Act: "We need this vital measure. It is another important tool in our constant quest to get a dollar's worth of value for every defense dollar spent." Thus, in periods of both increase and decline in procurement renegotiation has been deemed necessary for the national welfare. * * * (*Id.* at 15–16.)

\* \* \* \* \* \*

The continuing need for renegotiation was stated by President Eisenhower in his already quoted message as follows:

"In spite of major improvements, which we have achieved in our contracting and price redetermination

operations, there nevertheless remains an area in which only renegotiation can be effective to assure that the United States gets what it needs for defense at fair prices. * * * "

(*Id.* at 16.)

\* \* \* \* \* \*

Renegotiation also has an impact on procurement as a deterrent against over-pricing. Over the years, procurement officials have repeatedly testified to the value of renegotiation in their endeavor to negotiate closer prices; realizing that excessive profits will have to be refunded, contractors are more likely to agree to reasonable prices. The Senate Committee on Finance also recognized this effect of renegotiation in its 1966 report, in which it recommended an extension of the act:

" * * * the renegotiation process has had a deterrent effect on overpricing on Government contracts because of the realization that renegotiation is backstopping the allowable profits. (S.Rept.No.1295, 89th Cong., second sess. 2 (1966).)"

(*Id.* at 17–18.)

Congress has implemented this important governmental policy in the Renegotiation Act, and has provided for prompt recovery of excessive profits as determined by the Board. The procedures, as noted, provide adequate protection of the interests of contractors, like the plaintiff, who voluntarily become subject to the procedures by entering into contracts with the Government. Since 1951, contractors have been able to avoid summary collection by filing the requisite bond. Given the importance of the governmental interest, the court should be reluctant to hold that the procedures in the Act do not comport with due process. The asserted financial distress of the plaintiff is appealing, but is an insufficient ground for overturning these procedures. In Bowles v. Willingham, *supra,* involving wartime rent control orders imposed on landlords in certain areas

without notice or hearing, the Supreme Court stated that general statutes within the state power are passed that affect the person or property of individuals almost to ruin without any hearing; yet the Court held that the interests of those aggrieved were protected by the availability of judicial review. The Court stated:

* * * To be sure, that review comes after the order has been promulgated; and no provision for a stay is made. But as we have held in Yakus v. United States, *supra,* that review satisfies the requirements of due process. * * * "Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate. * * * Delay in the judicial determination of property rights is not uncommon where it is essential that governmental needs be immediately satisfied." [Citation omitted.] (321 U.S. at 520, 64 S.Ct. at 650.)

Given the contractual framework of the renegotiation law, the present plaintiff's due process arguments are lacking in merit.

One further point should be made. Plaintiff, and the majority, note that some district courts, in considering suits by the United States for collection of excess profits determined by the Board while redetermination proceedings were pending in the Tax Court, balked at or complained about the unfairness of enforcing orders of the Renegotiation Board they had no power to review. In some of the cases cited by the majority, the contractor did not apparently have the option of avoiding collection by posting a bond or other security. In most cases, notwithstanding their reluctance, the courts granted the requested judgments in favor of the United States. *E. g.,* United States v. Hopkins, 95 F. Supp. 14 (N.D.Ohio 1950); United States v. Clark, 72 F.Supp. 393 (D.Or. 1947). Other courts during the same period followed the statutory directives of

Section 108(b) without expressing any such disapproval. United States v. Shanaman, 123 F.Supp. 402 (E.D.Pa.1954); United States v. American Textile Machine Corp., 119 F.Supp. 253 (M.D.Tenn. 1953), rev'd on other grounds, 220 F.2d 584 (6th Cir. 1955); United States v. Edward Valves, Inc., 101 F.Supp. 559 (N.D.Ind.1951), aff'd, 207 F.2d 329 (7th Cir. 1953), cert. denied, 347 U.S. 934, 74 S.Ct. 629, 98 L.Ed. 1085 (1954). No recent cases have been found in which the courts expressed disapproval of the statutory procedures. In Hermetic Seal Prod. Co., P. R. v. United States, 307 F.2d 809 (1st Cir. 1962), the court agreed to stay a judgment in favor of the United States for excess profits pending resolution by the Tax Court of an important question of coverage of the act. However, that decision was shortly thereafter vacated when the court was informed that the petitioner had failed to file the required bond in the Tax Court; the court enforced the mandatory statutory procedures. 309 F.2d 482 (1st Cir. 1962), cert. denied, 371 U.S. 954, 83 S.Ct. 510, 9 L.Ed.2d 501 (1963), *Accord*, United States v. Rockland Steamship Corp., 218 F.Supp. 509 (S.D.N.Y.1963).

It is my opinion that, as a matter of law, plaintiff has failed to establish its contention that due process would be denied by granting immediate judgment in favor of the defendant on its counterclaim. Having voluntarily entered into contractual relationships with the United States, with knowledge that its profits would be subject to renegotiation and to all the provisions of the Renegotiation Act, as amended, plaintiff has effectively waived the right to challenge on constitutional grounds the clear requirements of Section 108(b). Even if a challenge on due process grounds is permissible, the statutory provisions comport with the requirements of due process, and afford adequate protection of the plaintiff's interests. Congress has expressed an important governmental interest in promptly recovering excessive profits as determined by the Renegotiation Board. Given this important governmental inter-

est, there is no fundamental unfairness in postponing the judicial inquiry until after the Government has had the opportunity to collect the amounts determined by the Board. Plaintiff's interests are fully protected by the ready availability of the de novo redetermination proceeding in this court, wherein the major burden of proof is on the Government.

It is interesting to note the potential anomaly the majority decision creates between the situation of this plaintiff and that of another contractor, in similar financial straits, who has money due from the United States on account of other contracts. In the latter situation, the Government can "execute" the Board order simply by withholding payments due under other contracts. No relief would be available to that contractor pending the conclusion of redetermination proceedings in this court. The instant plaintiff, by the happenstance of having ostensibly received all the amounts due on its contracts, has, temporarily at least, been able to frustrate the Congressional policy favoring prompt judgment for the excess profits determined by the Board, without giving the Government security in the form of a bond.

I agree that the statutory requirement might work a hardship on a contractor who is financially unable to provide a bond. It is no greater hardship than would be experienced by an insolvent contractor if the Government took over his only remaining asset by deducting the excessive profits found by the Board from amounts due him on other contracts. However, if actual or protential hardship is to be relieved, the remedy should be provided by Congressional amendment of the applicable law rather than by the court.

The Government's motion for judgment in aid of the execution of the Renegotiation Board's order of August 4, 1971, was filed in this court on January 28, 1972. The question before us has been fully briefed and argued before the full court by both parties. For the foregoing reasons, I would follow the deci-

sions of the First Circuit and the District Courts, cited above, and grant the Government's motion for judgment. At the same time, I concur fully in the court's denial of the Government's motion for a default judgment, dismissing plaintiff's petition, and I would remand the case to the trial commissioner for a de novo redetermination of the amount of excessive profits realized by plaintiff.

SKELTON, and KUNZIG, Judges, join in the foregoing opinion concurring in part and dissenting in part.