## MANUFACTURERS SERVICE CO., INC.

v.

## The UNITED STATES.

### No. 336–74.

United States Court of Claims.

June 25, 1975.

Nelson L. Bain, Washington, D. C., for plaintiff; Loren K. Olson, Washington, D. C., attorney of record. Morgan, Lewis & Bockius, Washington, D. C., of counsel.

Howard G. Slavit, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR JUDGMENT IN AID OF EXECUTION OF THE RENEGOTIATION ORDERS OF JUNE 25, 1974

KUNZIG, Judge:

The question here at issue is whether the filing of a bond in an amount less than 100 percent of the net excessive profits[1] found by the Renegotiation Board (Board) is sufficient to stay the execution of the Board's order during *de novo* redetermination in this court. A similar issue is presented in *Bannercraft Clothing Co., Inc. v. United States,* Ct.Cl., 518 F.2d 605, also decided today. We hold that execution of the Board's order is stayed only by the filing of a 100 percent bond.

Plaintiff[2] filed its petition in this court on September 17, 1974 for a rede-

---

1. Net excessive profits are the excessive profits found by the Renegotiation Board less appropriate tax credits. Before issuing an order, the Board adjusts the excessive profit computation to reflect allowable credit for any taxes measured by income, exclusive of Federal income taxes. A further credit for Federal income taxes is computed by the Internal Revenue Service subsequent to the Board's order. In computing the amount of the bond to be filed in order to stay the execution of the Board's order, our court rules require 100 percent of the net amount owed. Where the Internal Revenue Service has not yet determined the exact amount of the Federal tax credit, this court will accept plaintiff's good faith estimate of the offset, subject to modification when the actual figures are known. *See* text at pages 1206–1208 *infra* where Ct.Cl.R. 26(e) is discussed.

2. Plaintiff commenced business in 1956; became a partnership in 1959; was incorporated pursuant to the laws of Wisconsin on November 11, 1967; and was dissolved by resolution of the shareholders effective January 31, 1970.

termination of excessive profits for fiscal years 1967,[3] 1968,[4] and 1969,[5] under Section 108 of the Renegotiation Act of 1951, 50 U.S.C. App. § 1218, *as amended* (Supp. II, 1972). Its renegotiable sales, according to the petition, were $5,655,467[6] and its renegotiable profit was $981,957,[7] of which the Board determined that $418,279 was excessive.[8] Federal tax credits for the years at issue were determined by the Internal Revenue Service to be $204,294.71,[9] leaving the Board's determination of net excessive profits at $213,984.29.[10]

On September 27, 1974, ten days after filing its petition, plaintiff tendered to the court bonds in the amount of $150,000, approximately 70 percent of the net amount of the Board's orders. Accompanying the bond was a motion for waiver of Ct.Cl.R. 26(b) and for leave to file bond in lesser amount. Defendant filed its opposition to plaintiff's motion on October 3, 1974 and, on November 7, 1974, filed the present motion for judgment in aid of execution of the Board's orders,[11] the single issue now before this court.

Plaintiff's opposition to defendant's motion is grounded on the same arguments presented to Trial Judge White in plaintiff's motion for waiver of Ct.Cl.R. 26(b) and accompanying request to file

bond in lesser amount. It is plaintiff's position that this court has discretion to determine the amount of bond needed to stay execution of a Board order; that a trial judge, under Ct.Cl.R. 26(e) has the authority to enter an order permitting the acceptance of bonds in an amount less than 100 percent; and that the court has the authority to waive the 100 percent provision of Ct.Cl.R. 26(b).

Defendant on the other hand, argues to the opposite effect, submitting that acceptance of a bond in an amount less than 100 percent would run directly counter to Congressional intent and be highly prejudicial to the interests of the Government. Defendant asserts that Ct. Cl.R. 26(e) must be construed consistently with both the language of the Renegotiation Act itself and with the 100 percent requirement of Ct.Cl.R. 26(b). For the reasons stated below, we hold for defendant.

Congress enacted the first Renegotiation Act (Act of April 28, 1942, ch. 247, § 401 et seq., 56 Stat. 245) during World War II. This first enactment contained no provision for judicial redetermination. Recognizing the unfairness of denying recourse from an adverse determination by the Board, Congress amended this Act two years later (Act of Feb. 25,

3. Fiscal year 1967 commenced January 1, 1967 and ended November 11, 1967. The ending date corresponds to the date of incorporation. Plaintiff was thus a partnership for fiscal year 1967.

4. Fiscal year 1968 commenced November 12, 1967 and ended May 31, 1968. Plaintiff was first treated as a corporation for fiscal year 1968.

5. Fiscal year 1969 commenced June 1, 1968 and ended May 31, 1969.

6. Renegotiable sales for each component year were as follows:
   FY 1967—$1,798,179
   FY 1968—$1,395,819
   FY 1969—$2.461.469

7. Renegotiable profit for each component year was as follows:
   FY 1967—$304,105
   FY 1968—$278,130
   FY 1969—$399,722

8. Annual excessive profits, adjusted for taxes measured by income, other than Federal taxes, were as follows:
   FY 1967—$110,699
   FY 1968—$145,862
   FY 1969—$161,718

9. Federal tax credit for each component year as determined by the Internal Revenue Service was as follows:
   FY 1967—$43,625.47
   FY 1968—$75,282.12
   FY 1969—$85,387.12

10. Net excess profits found by the Renegotiation Board adjusted for Federal tax credit for each component year were as follows:
   FY 1967—$67,073.53
   FY 1968—$70,579.88
   FY 1969—$76,330.88

11. On November 18, 1974, Senior Trial Judge White denied, without prejudice, plaintiff's September 27, 1974 motion and stated, "the matter will be determined by court on defendant's motion filed November 7, 1974."

1944, ch. 63, § 701, 58 Stat. 78), allowing redetermination in the Tax Court. However, the 1944 amendment specifically stated that the filing of a petition for redetermination in the Tax Court "shall not operate to stay the execution of the order of the Board * * *" (Act of Feb. 25, 1944, ch. 63, § 701, 58 Stat. 87). Thus, from the inception of the redetermination provision under the first Renegotiation Act, the total separation of the redetermination and collection functions clearly reflected a Congressional intent to structure judicial redetermination utilizing a collect now, litigate later technique similar to techniques used under revenue statutes.[12]

The Renegotiation Act of 1951 (as first passed, 50 U.S.C. App. §§ 1211–1223 (1952)) was enacted during the Korean conflict and in most respects paralleled the World War II Act. However, the no-stay language of the first Act was replaced by the following provision:

> * * * The filing of a petition under this section shall operate to stay the execution of the order of the Board * * * if within ten days after the filing of the petition the petitioner files with the Tax Court a good and sufficient bond, approved by such court, in such amount as may be fixed by the court. 50 U.S.C. App. § 1218 (1952).

In explaining the addition of this bond provision, Representative Wilbur Mills of the House Ways and Means Committee stated on the floor of the House that the purpose of the bond language was to recognize in the statutory scheme existing informal practices followed by the Government under the first Renegotiation Act.[13]

50 U.S.C. App. § 1218 was subsequently amended by the Act of August 1, 1956, ch. 821, § 11(a), 70 Stat. 791, to read:

> * * * The filing of a petition under this section shall operate to stay the execution of the order of the Board * * * *only* if within ten days after the filing of the petition the petitioner files with the Tax Court a good and sufficient bond, approved by such court, in such amount as may be fixed by the court. (Emphasis added)

Both the House and Senate Reports specifically stated that the word "only" was inserted to clarify the original intention of Congress: that the filing of a good and sufficient bond is *required* to stay an order of the Renegotiation Board. H.R.Rep.No.2549, 84th Cong., 2d Sess. 9–10 (1956) and S.Rep.No.2624, 84th Cong., 2d Sess. 11 (1956).

The transfer of jurisdiction to this court in 1971 under Public Law 92–41 retained the substantive language of § 1218 after the 1956 amendment, and merely substituted the Court of Claims in place of the Tax Court as the redeter-

---

**12.** The Supreme Court has upheld the constitutionality of the pay now, litigate later scheme of contesting unilateral revenue determinations similar to the scheme utilized in the instant case. Where an adequate opportunity is afforded for a later judicial determination of the legal rights, summary proceedings to secure prompt performance of pecuniary obligations to the government have been consistently sustained and found not to constitute a denial of due process. *Phillips v. Commissioner,* 283 U.S. 589, 595, 51 S.Ct. 608, 75 L.Ed. 1289 (1931). *See also Bob Jones University v. Simon,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974) and *Alexander v. "Americans United" Inc.,* 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974).

**13.** The bond provision was added by amendment on the floor of the House of Representatives. In supporting this provision, Representative Wilbur Mills, a member of the House Ways and Means Committee, stated:

"I have discussed the gentleman's amendment with some of the members of the [Ways and Means] committee on this side and we see no objection to it. It may be that some changes will have to be made elsewhere in the bill, but the idea of the gentleman's amendment seems to be sound. I might call the gentleman's attention to the fact that, although it was not contained in the law during World War II, the filing of a bond with the Department of Justice would stay the execution of the order of the Board. There was an informal arrangement worked out to accomplish the same result so the gentleman's amendment is somewhat in keeping with that past practice. We have no objection to the amendment on this side." 97 Cong.Rec. 605 (1951) (remarks of Representative Mills).

mining court. This transfer of jurisdiction brought about one incidental change of possible significance. For the first time, both the collecting court and the redetermination court were one and the same. However, as we stated in *Sandnes' Sons, Inc. v. United States,* 462 F.2d 1388, 1390, 199 Ct.Cl. 107, 111 (1972), "without any clear indication [from Congress] that the position of the parties respecting collection is altered, no change would be implied." In other words, the pay now, litigate later sequence has been carried over to judicial redetermination in this court.

To summarize, Congress has consistently provided for immediate execution of an order of the Renegotiation Board separate and apart from judicial redetermination in such cases. The legislators finally did permit a stay of execution, but then only together with the timely filing of a bond.

Plaintiff, while not challenging the constitutionality of the pay now, litigate later technique employed by 50 U.S.C. App. § 1218, seems to take the position that the term "good and sufficient bond" when read in conjunction with "in such amount as may be fixed by the court" confers judicial discretion to set bond requirements on a case-by-case basis. In support of this premise, plaintiff places great reliance on the language of Ct. Cl.R. 26(e). However, plaintiff has misconstrued the court's intention in promulgating this rule and reads more discretion into § 1218 than we feel was intended by Congress.

In promulgating Ct.Cl.R. 26, this court followed the mandate of § 1218. In order to stay the execution of a Board order, plaintiff must file a bond within ten days after filing a petition. Ct.Cl.R. 26(a). A 100 percent surety[14] or collateral[15] bond has been fixed by the court as being "good and sufficient" to stay the execution of the Board's order. Ct. Cl.R. 26(b). In addition, the court added the following proviso:

* * * Nothing contained in this rule [Ct.Cl.R. 26] shall preclude the entry at any time by the court (or the commissioner) of an order requiring that the amount of the bond be increased or decreased, upon a satisfactory showing that such increase or decrease is necessary. Ct.Cl.R. 26(e).

■ It is our view that the 100 percent bond requirement embodied in this rule adequately provides the protection Congress intended. After reviewing the legislative histories of the various Renegotiation Acts, there can be little doubt that Congress, in providing for the immediate execution of the Board's order, intended to insure the protection of the Government's interest against the dissipation of a plaintiff's assets during the pendency of the litigation. Surely no less protection was intended by permitting a stay of the execution and the prompt filing of a good and sufficient bond. We are convinced that Congress chose the words "in such amount as may be fixed by the court" to allow this court to decide if a 100 percent bond was sufficient to provide the same security as would the execution of a judgment. While this court could have set some higher percentage amount, we are persuaded that 100 percent is sufficient to comply with the Congressional mandate of § 1218 and have fixed this amount accordingly.[16]

14. Ct.Cl.R. 26(c) defines sureties as follows: "Acceptable sureties on bonds shall be those bonding companies holding certificates of authority from the Secretary of the Treasury. (See the latest U. S. Treasury Dept. Circ. 570)."

15. Ct.Cl.R. 26(d) limits acceptable collateral as follows: "If collateral is to be deposited as security for a bond, in lieu of a surety, United States Government marketable public securities, fully negotiable by the bearer, owned by the plaintiff, in a sum equal at their par value to the amount of the bond to be furnished, will be acceptable when accompanied by the necessary power of attorney."

16. It should be noted that the Tax Court, our predecessor as redetermining court, required the filing of a 112 percent bond as the minimum bond sufficient to stay the execution of the Board's order. *See* Tax Court Rule 65(b) (1958 revision).

Having fixed in our rules the required bond amount at 100 percent, we are of the opinion that Congress has prohibited us from even considering the proffer of a lesser percentage. This Congressional prohibition is the only logical interpretation of the ten day filing requirement imposed by § 1218. As we noted earlier, Congress amended § 1218 in 1956 to clarify the original intention of the bond provision. Only the prompt filing of the required bond would serve to stay the execution of the Board's order. By limiting the filing time, we think Congress implicitly precluded a case-by-case determination of what constitutes a "good and sufficient" bond. The very nature of plaintiff's original motion (to file a 70 percent bond) and opposition to defendant's motion for judgment in aid of execution would require this court to defer action beyond the ten day limit, particularly when the lesser bond is not even tendered until the final filing day. This is precisely the kind of situation which we believe Congress intended to avoid.[17]

■ Given the statutory constraints, we are of the opinion that plaintiff's suggested interpretation of Ct.Cl.R. 26(e) is misconceived. This rule was promulgated for a specific, limited purpose. Rather than authorizing this court to tailor the bond to an individual plaintiff at its original filing, Ct.Cl.R. 26(e) merely provides a mechanism for adjusting the *dollar* amount of an already filed bond where changed circumstances dictate

such an alteration.[18] Such alteration of the dollar amount would be permitted only in those situations where one of the parties makes a showing that such adjustment is necessary to maintain the 100 percent equilibrium. To give this rule any other interpretation would have the effect of rendering the ten day filing time meaningless.

■ Since we deem it clear from the above discussion that plaintiff's tender of less than a 100 percent bond does not comply with our rule to stay the execution of the Board's orders, defendant's motion for judgment in aid of execution must be granted absent some unusual or mitigating circumstances that excuse plaintiff's failure. In the instant case, plaintiff has not succeeded in making such a showing.

This court has previously stated that a plaintiff seeking to avoid suffering execution of a judgment for failure to file the required bond must clearly show that the granting of the judgment might serve to "chill" the *de novo* redetermination litigation. *Sandnes' Sons, Inc. v. United States, supra.* The mere showing of financial hardship has been held to be insufficient to excuse noncompliance. *O'Brien Gear & Machine Co. v. United States,* 199 Ct.Cl. 1014 (1972).

Plaintiff has not shown any circumstances which would justify our denial of defendant's motion. In fact, plaintiff has merely asserted that the bond tendered in the instant case might well

**17.** Our granting of plaintiff's request would have the effect of forcing this court to go into the bonding business. We would be compelled in each instance to review plaintiff's financial condition and ascertain valuation of various assets to determine if a plaintiff's tendered bond did, in fact, afford the Government with adequate protection against the threat of dissipation of said assets. It seems apparent that such an exercise would, by its very nature, extend considerably beyond the ten day period specified by Congress in 50 U.S.C. App. § 1218. This court lacks the investigatory facilities necessary for such a prompt evaluation and would be forced to conduct a trial to determine sufficiency. During this entire reviewing period, the Government would be left totally unprotected, having neither a bond nor any judicial means for collecting the amount

deemed owed by the Renegotiation Board. Moreover, case-by-case review would encourage the filing of frivolous appeals by plaintiffs seeking only to delay payment of Board orders. Such a result would clearly contradict the Congressional intention to utilize the pay now, litigate later sequence of § 1218.

**18.** Such changed circumstances might include revision of a tendered 100 percent bond based on plaintiff's good faith estimate of Federal income tax credit when the actual figures became known. *See* note 1, *supra.* Additionally, other circumstances might necessitate an adjustment of the dollar amount, e. g., recalculation by the Board of the amount deemed excessive. However, it is clear that such revision occurs only after the initial filing of a 100 percent bond.

provide defendant with better protection than the Government might obtain through seizure of plaintiff's assets under a judgment. Even assuming plaintiff's assertions to be correct, we feel constrained to point out that it is defendant's prerogative to decide for itself how it can best protect its interest. It is not the role of this court or plaintiff to make this executive determination.

We thus conclude that where a 100 percent bond is not timely filed, the Government possesses an immediate right to seek a judgment in aid of execution. Such judgment will be granted absent some compelling showing of unusual or mitigating circumstances. It is defendant's responsibility to use the judgment wisely. If defendant ascertains that the Government is in little danger of dissipation of plaintiff's assets, then it should negotiate a payment plan or other alternative with plaintiff so that plaintiff's business is not unnecessarily disrupted. But we as a court must presume that the Government will act in good faith and in the public interest. Plaintiff has not made any showing which rebuts this presumption.

Accordingly, defendant's motion for judgment in aid of execution of the Board's order is granted and judgment is entered in the amount of two hundred thirteen thousand nine hundred eighty-four dollars and twenty-nine cents ($213,984.29), with interest as provided by law. 50 U.S.C. App. § 1215(b)(2).

NICHOLS, Judge (concurring):

I concur in the opinion and judgment but would like to add the following observations.

We have in the above case and in *Bannercraft Clothing Co., Inc.,* Ct.Cl., two more of what bids fair to be an endless series of impecunious defense contractors seeking relief from excessive profits determinations. We naturally think of one who has allegedly realized excessive profits as being richer than we would deem proper. Why is he so often at the other end of the economic scale? If we can explain this apparent paradox, a more satisfactory disposition of the cases may be possible.

At times the condition results from an uneven distribution of profit and loss contracts over different fiscal years, with insufficient impact of carry forward and other equalization measures. See my article, *Equalizing Profit and Loss In Renegotiation,* 45 Va.Law Rev. 41 (1959). Other times those in control of corporations or partnerships have taken advantage of the usual long lapse of time between the end of a fiscal year and a Board order dealing with that year, to drain off the profits to transferees. Despite mistaken assertions to the contrary, dissenting in *Sandnes' Sons, Co. v. United States,* 462 F.2d 1388, 1395, 199 Ct.Cl. 107, 120 (1972), it is also perfectly possible for a person who never does business with the United States, never has a contract or purchase order containing a renegotiation clause or notice, and never heard of the Renegotiation Act to become subject to renegotiation. Such person may pay off profits to stockholders or creditors without setting up a proper reserve for this liability, and learn of it only later. Thus we are dealing with some people who have got into this predicament without any fault or negligence of their own, and with others whose good faith we may well decry. But even this latter group may ask where is the provision in the Renegotiation Act to bar their distributing assets to transferees while a renegotiation is pending? None can be found.

I hasten to add, I have no idea in which category the parties now before us belong.

The collection provisions of the Renegotiation Act of 1951, 50 U.S.C. App. § 1215(b)(1) and ff. were originally drafted for the 1943 Act, in the midst of World War II. At that time no one could do business in many industrial lines of endeavor, unless he did renegotiable business. It appeared reasonable to look to the withholding of payments on future defense contracts or subcontracts as the primary means of enforcing liability to refund excessive profits on prior

contracts or subcontracts, pursuant to agreement or order. In any event, the impact of wartime excess profits taxes made it necessary to collect only about 20% of refund determinations made. As a backup method of collection only, suit was provided for in § 1215(b)(3). There was and is no provision for jeopardy assessment or transferee liability. To the contrary, assignee banks and Miller Act sureties are protected and are not required to assist in refund collection in any way. § 1215(b)(4) and (5).

I well remember responsible officials of the then renegotiating agencies predicting that if renegotiation continued in effect after V–J day, collection would become an insuperable problem. Yet it has never been squarely confronted and appropriate collection measures have never been devised for the new situation.

The instant case involves FY's 1967, 68 and 69, and *Bannercraft* 1966 and 67. Thus we have renegotiation proceedings dragging along year after year, with nothing done to exact security for payment, and nothing that can be done. Maybe, many times, the horse has long since been stolen when the barn door is locked, *i. e.,* when the order enters and the petition is filed here. If they want to stay collection, they then must file their bonds. Bonds are hard for the impecunious to come by in these times, if they were ever easy, except for those so prosperous as to need no bonding.

If they don't file the required bonds within ten days, we must enter judgment on the Government's counterclaim. Such, we held in *Sandnes'* and again today, is the intent of Congress. In *Sandnes'* we deferred the judgment pending inquiry whether the plaintiff's right to due process was unconstitutionally chilled, but even this mild temporizing was vehemently protested by three dissenters. In any case, that plaintiff never made the required showing and ultimately the judgment was entered as demanded.

In my view, 99% of the time the judgment on the counterclaim will either be needlessly harsh on one who has got into difficulty by no fault of his own, or else will be too late to prevent diversion of funds the Government had a right to expect—at least, a moral right—would be held as a reserve to satisfy the renegotiation liability when determined. The procedure in my view, has no relation to a rational program to secure the Government against diversion of excessive profits into unreachable pockets.

Some times it may be appropriate to strain the interpretation of a statute to make it conform to reality. I do not think this is such a case. Any effort of ours along such a line would, I think, only make matters worse. In case of doubt, it is not a bad idea to find out what the intent of Congress is, and to do just that.

I don't think it is improper for us, however, to note the existence of a problem Congress has perhaps not solved, and to recommend a study of it by an executive or legislative agency having the authority and facilities to do so, with a view to possible new legislation. In such an investigation our case files would be prime sources of relevant data.

DAVIS, Judge (dissenting):

Although it is clear that Congress wished to protect the United States during court redetermination of a finding of excessive profits by the Renegotiation Board, there is absolutely nothing in the text of the Act or the legislative history to compel the requirement of a 100% bond or to forbid a bond in a lesser sum if it is deemed to be "good and sufficient." I read our Rule 26 in the same way. Paragraph (b) provides that, normally and in ordinary course, a 100% bond is to be filed, but paragraph (e) says: *"Nothing contained in this rule shall preclude the entry at any time by the court (or the commissioner [trial judge]) of an order requiring that the amount of the bond be increased or decreased, upon a satisfactory showing that such increase or decrease is necessary"* [emphasis added]. This all-embracing language encompasses the possibility of a less-than-100%-bond, from the

beginning, if such a smaller obligation is determined to be "good and sufficient" in the particular circumstances.

This plaintiff, within the ten-day period, proffered a 70% bond, asserting that (a) it was unable to obtain a bond in the higher amount, and (b) that the tendered bond provided the Government with better protection than could be obtained through seizure of the dissolved corporation's assets under a judgment of the kind the court now grants. In the present posture of the case, these allegations must be accepted. If true, they seem to me to satisfy all the requirements of both the statute and Rule 26. I would therefore remand the case to the trial division to determine the accuracy of the company's assertions.*

The court suggests that this procedure would force the court "to go into the bonding business." I do not agree because I do not think that most, or even many, of the class of renegotiated contractors can make *under oath* the allegations made here—that a 100% bond is unobtainable and that better protection will be afforded the Government by the proffered bond than by execution under judgment for the amount of the renegotiation orders. To allow this contractor the opportunity to prove its case does not mean that we have to do the same for others who cannot make the same assertions under penalty of perjury.

On the other hand, the consequence of the court's ruling is that this contractor is put at the Government's mercy—the Government can execute at will on the corporate property—even though, so far as we know now, the defendant does not need in this case such unlimited and potentially destructive power in order to be protected against loss. As between some inconvenience to the court and potential injury of this stripe to a contractor, I would choose the former. Indeed, the burden of litigation is likely to be less

than we now have from contractors contesting the Government's motions for judgment in aid of execution of the renegotiation orders (where no bond or less than a 100% bond is filed).

---

* During the time the trial division takes to determine this issue, the Government would be protected by the 70% bond. If no bond at all is filed and the contractor litigates, as the court acknowledges he can, the defendant's

motion for judgment in aid of execution of the renegotiation orders, there is no protection at all for the Government during the period of consideration and determination of that motion.