**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY**

v.

**The UNITED STATES.**

**No. 341–74.**

United States Court of Claims.

Dec. 17, 1975.

**1214**

K. Martin Worthy, Washington, D. C., attorney of record for plaintiff; Lee I. Park, Gerald D. Morgan, John G. De-Gooyer, and Hamel, Park, McCabe & Saunders, Washington, D. C., of counsel.

Frank H. Clabaugh, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, for defendant; Bernard M. Brodsky, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case involves renegotiation proceedings, commenced in 1958, pursuant to the Renegotiation Act of 1951, as amended, 50 U.S.C. App. § 1211 et seq., for plaintiff's fiscal year ending December 31, 1957. Plaintiff and defendant executed a series of written agreements to extend the statute of limitations prescribed in section 105(c) of the Renegotiation Act of 1951, 50 U.S.C. App. § 1215(c); however, the last agreement expired on June 30, 1973. The Renegotiation Board issued an order against Newport News determining excessive profits, within the meaning of the Renegotiation Act, for plaintiff's fiscal year ending December 31, 1957, in the gross amount of $1,000,000, but did so on June 25, 1974, a year after the last agreement between plaintiff and defendant extending the statute of limitations had expired. Plaintiff filed suit in this court on September 20, 1974, contesting the Renegotiation Board's determination and thereafter moved for summary judgment. In Count 1 of its petition plaintiff urged that when the statutory period, as extended by mutual agreement, for completion of the renegotiation of plaintiff's fiscal year 1957, expired on June 30, 1973, without an agreement or order determining plaintiff's liability for excessive profits, if any, for fiscal year 1957, plaintiff's liability was thereupon discharged by operation of section 105(c) of the Renegotiation Act. We agree, and therefore grant plaintiff's motion for summary judgment on Count 1. This in effect disposes of the entire case.

### I.

The events that led to the controversy were as follows: Plaintiff, Newport News Shipbuilding And Dry Dock Company (the contractor) is a corporation engaged in the construction and design of oil tankers, passenger and cargo ships, major Navy ships, the conversion and repair of such ships, and the manufacture of hydraulic turbines and other equipment for hydroelectric plants, pressure vessels for refineries and chemical plants, and paper and pulp mill machinery and castings. During the fiscal year ending December 31, 1957, plaintiff's renegotiable business consisted of the substantial completion of the aircraft carrier RANGER, continuation of the contractor's activities in the design, development and construction of a prototype nuclear reactor for the propulsion of large surface ships, continuation of construction of two LST's for the Navy, construction and completion of two passenger-cargo vessels for Grace Lines, Inc., continued construction of the FORRESTAL, new construction on the nuclear

attack submarine SHARK and the nuclear-powered aircraft carrier ENTERPRISE and general ship repair and conversion. On June 24, 1958, the statutory Renegotiation Board assigned the renegotiation of plaintiff's renegotiable income for 1957 to the New York Regional Renegotiation Board, which commenced proceedings by sending notice, as required by section 105(a) of the Renegotiation Act, 50 U.S.C. App. § 1215(a), by registered mail to plaintiff on June 30, 1958.

Extensive correspondence between plaintiff and the Regional Board followed. On January 20, 1960, plaintiff, at the request of the Board, duly executed an agreement with the Regional Board extending the statutory period for completion of the 1957 renegotiation proceedings to December 31, 1960. The extension was necessary because of 50 U.S.C. App. § 1215(c), which reads as follows:

> * * * If an agreement or order determining the amount of excessive profits is not made within two years following the commencement of the renegotiation proceeding, then, in the absence of fraud or malfeasance or willful misrepresentation of a material fact, upon the expiration of such two years all liabilities of the contractor or subcontractor for excessive profits with respect to which such proceeding was commenced shall thereupon be discharged, except that * * * such two-year period may be extended by mutual agreement.

The renegotiation proceedings had bogged down because of a controversy between plaintiff and the Navy over the amount to which plaintiff was entitled under a contract it had with the Navy, dated February 3, 1954, (NObs–3557) for the construction of the aircraft carrier RANGER. Article 6 of the contract provided that the total fixed price would be subject to adjustment, upward or downward, for changes in material and labor costs, to be determined on the basis of industry cost indices computed by the Department of Labor. Pursuant to this provision, plaintiff filed an escalation claim with the Navy on September 30, 1958, seeking an adjustment of $7,284,236.45, of which $2,192,582.50 was included as income for 1957. But the contract further provided that the Contracting Officer might deny an upward adjustment if he should find that it was "not required, in whole or in part, to enable the contractor to earn a fair and reasonable profit under the contract." By letter dated June 1, 1960, the Contracting Officer denied the adjustment in full on the ground that the profit already accrued was fair and reasonable. Plaintiff appealed the decision to the Armed Services Board of Contract Appeals (ASBCA) in June 1960.

Pending the outcome of the ASBCA decision, plaintiff, at the request of the New York Regional Board, executed several more agreements extending the statutory limitations period as follows:

| DATE OF AGREEMENT | DATE OF EXPIRATION OF STATUTE OF LIMITATIONS |
|---|---|
| July 25, 1960 | September 30, 1961 |
| May 24, 1961 | December 31, 1961 |
| July 25, 1961 | June 30, 1962 |

The Regional Board determined meanwhile that plaintiff's overall renegotiable profits for 1957 were reasonable, but that any additional renegotiable profits applicable to 1957 thereafter received by plaintiff as a result of its escalation claim would be considered excessive profits. The Regional Board offered plaintiff a conditional clearance to this effect, which the plaintiff refused and the case was thereafter, in November 1961, forwarded to the Statutory Renegotiation Board.

The Statutory Renegotiation Board and plaintiff, at the Board's request, executed a further series of agreements extending the statute of limitations period as follows:

| DATE OF AGREEMENT | DATE OF EXPIRATION OF STATUTE OF LIMITATIONS |
|---|---|
| May 2, 1962 | December 31, 1962 |
| December 11, 1962 | March 29, 1963 |
| February 19, 1963 | June 28, 1963 |

While the case was pending before the Top Renegotiation Board, ASBCA on February 28, 1962, denied the contractor's claim. 1962 BCA ¶ 3306. Plaintiff appealed to this court to reverse the ASBCA decision. The said Board, on February 14, 1963, after meeting with the contractor and visiting the shipyard, determined that the contractor's reported renegotiable profits, exclusive of escalation, were reasonable, but that any profits thereafter received from the escalation claim would be considered as excessive profits to be refunded to the Government. The Board offered to enter into a conditional clearance agreement pursuant to Part 1473 of the Renegotiation. Board Regulations with the contractor implementing its determination and at plaintiff's request issued a written summary of the facts and reasons supporting its decision.

By letter dated March 29, 1963, plaintiff advised the Board that it did not wish to enter into the proposed conditional clearance agreement. The contractor had appealed the decision to this court and was awaiting a decision on its claim. The contractor wrote:

Your letter also states that the determination of the Board is conditioned upon this Company's being successful in its claim for escalation under Contract NObs–3557. We would like to suggest again that because of the contingent nature of the determination it is not necessary for the Renegotiation Board to issue an order at this time. Rather it would seem appropriate to delay the order until the escalation matter is finally settled. We will grant any necessary extension of time for such purposes.

The Board responded to plaintiff by letter dated April 17, 1963, stating in pertinent part:

You propose that the Board delay its determination by deferring the issuance of a unilateral order for 1957 because of your claim for escalation in connection with the construction of the Ranger.

The Board has carefully considered your proposal, particularly in light of your offer to execute appropriate agreements extending the time in which the 1957 renegotiation proceeding may be completed. The Board has determined that it will defer the issuance of the order.

Please keep the Board advised of all pertinent developments in the Ranger escalation claim.

By letter dated April 23, 1963, plaintiff responded:

We shall keep the Board advised of all developments as to the claim for escalation on the Ranger contract. We will also execute any agreements necessary to extend the time within which the 1957 renegotiation proceedings may be completed.

Thereafter the Renegotiation Board and plaintiff, each time at the Board's request, executed eight agreements extending the statutory period for completion of the 1957 renegotiation proceedings as follows:

| DATE OF AGREEMENT | DATE OF EXPIRATION OF STATUTE OF LIMITATIONS |
|---|---|
| May 16, 1963 | June 30, 1964 |
| April 21, 1964 | June 30, 1965 |
| June 7, 1965 | June 30, 1966 |
| June 2, 1966 | June 30, 1967 |
| May 24, 1967 | July 1, 1968 |
| June 4, 1968 | July 1, 1969 |
| May 29, 1969 | July 1, 1971 |
| June 2, 1971 | June 30, 1973 |

The June 2, 1971 agreement extending the statute of limitations to June 30, 1973, was the last agreement requested by the Board and thereafter, no further written agreement was executed by the parties.

The extension agreements were necessary because the RANGER escalation claim was pending before this court. Our decision issued March 17, 1967, *Newport News Shipbuilding & Dry Dock Co. v. United States*, 374 F.2d 516, 179 Ct.Cl. 97. After examining the events that led to the controversy and the applicable contract provisions and the Armed Services Procurement Regulations we sus-

pended further proceedings before us to permit the ASBCA to determine the reasonableness of plaintiff's profits in light of the guidelines set forth in the Armed Services Procurement Regulations, 32 C.F.R. (Rev.1954, Cum.Supp., Jan. 1960), §§ 3.808—1 and 3.808—2. We held that the Board's failure to show that it had followed these guidelines was an error requiring a quasi remand of the type then usual.

In light of the court's instructions, the ASBCA held supplemental proceedings and thereafter, on January 27, 1971, issued a new opinion finding that under the applicable guidelines, receipt by the plaintiff of the full amount of the escalation adjustment would result in a "minimum fair and reasonable profit" on the RANGER contract. 71–1 BCA ¶ 8705. The ASBCA decision was reaffirmed on August 17, 1971, when the Navy's motion for reconsideration was denied. Finally, in April 1972, the Navy paid the $7,284,236.45 in dispute to the Newport News Company.

At this point the Renegotiation Board proceedings to determine plaintiff's liability for excessive profits for fiscal year 1957 were still pending. The statute of limitations had been extended by mutual written agreement to June 30, 1973, allowing the Board to issue an order prior to that point, although well over two years had passed since the renegotiation proceedings commenced. On April 20, 1972, the Assistant to the General Counsel, Department of the Navy, informed the Renegotiation Board that the Navy had paid the escalation claim. Thereafter by letter dated June 15, 1972, plaintiff also advised the Board that the escalation claim had been settled and requested reconsideration of its case in light of the subsequent developments. Essentially, plaintiff contended that since the ASBCA had determined that its profits under the RANGER contract were reasonable (therefore allowing an escalation adjustment), the Renegotiation Board should conclude that it did not realize excessive profits for 1957. In the first paragraph of its letter, plaintiff specifi-cally noted that "the time for completion of renegotiation for said year [1957] has been extended to June 30, 1973." On October 24, 1972, plaintiff submitted a statement summarizing the findings of the ASBCA as they related to each of the statutory factors in the Renegotiation Act and asked for a clearance for its fiscal year 1957. On December 19, 1972, plaintiff's representatives met with Renegotiation Board officials regarding the 1957 proceedings.

■ No further communication between plaintiff and defendant took place until October 17, 1973, when the Renegotiation Board sent a letter to plaintiff suggesting a hearing. Meanwhile, however, on June 30, 1973, the statute of limitations expired without an order or agreement determining plaintiff's liability for excessive profits or extending time. Defendant alleges that it was in the process of changing its record keeping from manual to computer operations and that the June 30, 1973, expiration date was never transferred to the computer. Further, defendant offers by way of explanation that the reviewer assigned to the case died prior to the June 1973 expiration. In the absence of fraud or malfeasance or willful misrepresentation of a material fact, none of which are alleged, we do not think the reason for the error is material.

After receiving defendant's October 17, 1973, letter, plaintiff informed the Board that the statute of limitations had expired, thus discharging plaintiff's liability. Plaintiff consented, by letter dated November 20, 1973, to meet with the Board on January 10, 1974, to discuss the merits of the case, with the understanding that it did not waive its contention that the statute of limitations had expired.

On June 11, 1974, the Renegotiation Board issued a Proposed Opinion that plaintiff realized excessive profits in the amount of $1,000,000 for fiscal year 1957 and requested plaintiff to advise the Board whether it was willing to enter into an agreement. By letter dated June 20, 1974, plaintiff refused to enter

into an agreement. Thereafter, on June 25, 1974, the Renegotiation Board issued a unilateral order against Newport News in the gross amount of $1,000,000.

The Board allocated only a part of the additional revenues resulting from the escalation claim to plaintiff's 1957 year and retreated from its original position to the extent of holding only part, not all, of the portion allocated to 1957 to constitute excessive profit. It should be noted that the issues before the ASBCA and the Renegotiation Board were not the same. The ASBCA dealt with revenues from the RANGER contract only, to whatever fiscal years allocated, while the Renegotiation Board dealt with all receipts and accruals for 1957, on an over-all fiscal year basis, not only the allocable portion of RANGER revenues, but other revenues as well. It may seem anomalous to have two sets of price redetermination procedures apply in part to the same contract revenues, but under existing law, neither one pre-empts the other. See our discussion of this problem in *Newport News, supra*. Until limitations ran, it cannot be blinked that the Board had an active right to propose its $1,000,000 figure, subject of course to *de novo* redetermination here.

Plaintiff filed suit in this court on September 20, 1974. The only issue before the court at this time is whether plaintiff's liability for excessive profits for fiscal year 1957 has been discharged by operation of section 105(c) of the Renegotiation Act.

## II.

The Renegotiation Act of 1951, as amended, is a reflection of the Congressional policy that excessive profits realized by government contractors in the performance of contracts relating to the national defense should be eliminated. 50 U.S.C. App. § 1211. The Act details the nature of the proceedings to be conducted by a Renegotiation Board, 50 U.S.C. App. § 1215, and specifically notes the factors to be considered by the Board in its determination of a contractor's liability for excessive profits. 50 U.S.C. App. § 1213(e). A statutory limitations period is written into the Act as quoted, *supra*.

There is no allegation in this case of fraud, malfeasance or willful misrepresentation of a material fact. Further, it is clear that no agreement or order determining excessive profits was issued within two years following the commencement of the renegotiation proceeding. The question then is whether the limitations period was extended by "mutual agreement" within the meaning of the statute. The parties did execute a series of written mutual agreements extending the statute of limitations to June 30, 1973. If the Board had issued its order prior to that date, plaintiff's argument would be unmeritorious as the statute specifically provides that the limitations period may be extended by mutual agreement. However, the Board did not issue its order until June 25, 1974. Plaintiff contends that its liability is therefore discharged. Defendant argues that a formal extension was not necessary because the plaintiff had agreed in 1963 to execute whatever extensions were necessary. Defendant also argues that equitable estoppel and implied waiver should be applied to toll the statute of limitations.

The language of the statute is unequivocal. If a renegotiation proceeding is not concluded by agreement or order within two years after the commencement of the proceedings (or within such time as the parties have mutually agreed to), the contractor's liability is "discharged." An examination of the legislative history of the Act reveals a Congressional intent to protect contractors from renegotiation proceedings that might continue indefinitely.

The first renegotiation law, passed in 1942 as § 403 of the Sixth Supplemental National Defense Appropriation Act (Pub.L. 528, 56 Stat. 244) did not contain any statute of limitations provision. The law was amended six months later in the Revenue Act of 1942 to eliminate some of the uncertainties in the practical administration of the legislation. One of

the most frequent objections to the original Act was that contracts remained subject to renegotiation until three years after the war. Hearings before the Subcommittee of the Finance Committee, U.S. Senate, 77th Cong., 2nd Sess., on § 403 of Pub.L. 528, September 29–30, 1942, at 21. To assuage contractor's complaints that the existing law "left [proceedings] open too long," *id.* at 25, Section 801(c)(5) of the Revenue Act of 1942, Pub.L. ch. 619, 56 Stat. 984, imposed a one-year limitation on the Government's power to initiate renegotiation proceedings. If the Government failed to give a contractor written notice that his profits might be excessive within one year after the contractor filed appropriate financial statements or within one year after the close of the fiscal year within which the contract at issue was completed or terminated, the contractor's liability for excessive profits realized during the fiscal year covered by the financial statement was discharged. This one year statute of limitations was designed to terminate the Government's power to commence renegotiation proceedings if appropriate action was not accomplished within the prescribed period. The Congress was attempting to remedy a situation whereby contractors were put in an unsettled position for an indeterminate period of time.

The Renegotiation Act was amended again in 1943. One of the problems the amendment was intended to remedy was the concern over the unreasonable delays in administering renegotiation. The Committee on Naval Affairs reported that "it seems to be the impression of industry that renegotiation, as it is now administered, hangs as a Damocles sword which may descend upon contractors years after the completion of their contracts, in an effort to recover funds which will have long since been expended. This, of course, is quite inconsistent with the purposes and provisions of the Act." House Committee on Naval Affairs, Report on Renegotiation of War Contracts, 78th Cong., 1st Sess. (1943) at 10. Although the law did require the agency to commence renegotiation proceedings within one year after the contractor filed financial statements or within one year after the contract was completed or terminated, the Congress felt that these limitations periods were inequitable as the statute could be tolled when the Government initiated a renegotiation proceeding, without concluding it. Thus the forerunner of the current two year limitation on renegotiation imposed by section 105(c) of the 1951 Act was enacted in 1943, reflecting a Congressional desire to place strict limitations on the amount of time the Government could take in processing renegotiation cases once proceedings had begun. The Naval Committee recommended that once the renegotiation proceeding was instituted, the contractor's liability for excessive profits should be discharged if neither a renegotiation agreement nor a unilateral determination by the Secretary resulted within 14 months of the contractor's filing of a financial statement. House Committee on Naval Affairs, Report on Renegotiation of War Contracts, 78th Cong., 1st Sess. (1943) at 11. As Congressman Disney remarked: "We want this business closed up." 89th Cong.Rec. 9928 (1943). Thus, the statutory limitations was added to the Act in 1943, providing:

> * * * If an agreement or order determining the amount of excessive profits is not made within one year following the commencement of the renegotiation proceeding, then upon the expiration of such one year all liabilities of the contractor or subcontractor for excessive profits with respect to which such proceeding was commenced shall thereupon be discharged, except that * * * such one-year period may be extended by mutual agreement. (Revenue Act of 1943, § 701(c), 58 Stat. 84.)

The statute of limitations in the 1951 Act imposes time limits upon the commencement and completion of renegotiation proceedings. No proceeding to determine excessive profits for any fiscal year may be commenced more than one year after the financial statement required from the contractor is filed with

the Renegotiation Board and every proceeding must be completed by agreement or order within two years after commencement; otherwise all liabilities of the contractor for excessive profits during such year are discharged. In enacting this provision, Congress was aware of the prior amendment to the Act and the need to commence and conclude renegotiation proceedings within a reasonable period of time. The Congress did provide that the two year period could be extended by mutual agreement, but determined that if such an extension was not effected, then upon the expiration of the two year period, a contractor's liabilities were discharged.

The instant case represents a situation where the pendency of price redetermination proceedings made it logical, if not necessary, to suspend the renegotiation until the receipts and accrual allocable to the year under review could be accurately known. Instead of resenting the suspension as a "sword of Damocles" the contractor desired it. Nevertheless, the statute is sweeping and free of ambiguity. Unless plaintiff agreed to an extension, its 1957 renegotiation is dead.

Since the original two year period admittedly expired in June 1960, defendant must show that the limitations period was extended by "mutual agreement." Neither the statute nor the applicable regulations explain what is necessary to constitute a "mutual agreement" within the meaning of the Act. There is no prescribed form in the 1951 Regulations which details the precise form of an agreement which would extend the statute of limitations. However, plaintiff and defendant did execute 15 written extension agreements between 1960 and 1971, all in virtually identical form. The extensions read as follows:

IT IS HEREBY STIPULATED AND AGREED by and between the UNITED STATES OF AMERICA and NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, a corporation organized and existing under the laws of the State of Virginia and having its principal office in the city of Newport News, Virginia (hereinafter referred to as "the Contractor"), that, in accordance with the provisions of Section 105(c) of the Renegotiation Act of 1951, the time within which a determination of the amount of excessive profits, if any, of the Contractor for its fiscal year ended ___ may be made by agreement or order pursuant to the Renegotiation Act of 1951, as amended, is hereby extended to and including ___.

In fact, the written extension agreements are similar to the form set out in the Regulations for the 1943 Act for extending the one year statute of limitations in that Act. Counsel offer no explanation why this change in Regulation occurred, and we know of none except by surmise, but in view of what happened it is clear no real change in the procedure of agreeing on extensions was intended. The fact that plaintiff and defendant did execute written agreements using the familiar pre-established form does indicate a course of conduct which should not be overlooked. Defendant's contention that the 1963 correspondence was in effect a "mutual agreement" to extend the statute of limitations until the escalation proceedings were completed does not coincide with the parties actual interpretation of the 1963 correspondence as evidenced by their actions, that is, the timely signing and execution of eight written agreements designed to extend the statute of limitations. If defendant believed that the 1963 correspondence was a "mutual agreement" satisfying the statute, as it now asserts, there would not have been any reason to execute the written extensions.

■ Plaintiff's undertaking "to execute any agreements necessary to extend the time * * *" as quoted, *supra*, must be read as meaning it would sign any agreement in the usual form timely proffered for signature. But even the commitment cannot be read as remaining open-ended after the Renegotiation Board knew the escalation claim had

been paid in full, so there existed no further reason for delay.

Thus, on June 30, 1973, when the last of the parties' formally executed time extensions expired without Board issuance of a renegotiation order, the plaintiff's liability according to the statute was discharged. There is no indication that the parties made any mutual agreement to extend the statute of limitations beyond that date. Plaintiff did not, merely by requesting the Board in 1972 to reconsider its determination in light of this court's remand and ASBCA's subsequent decision, waive its right to rely on the statute of limitations. Plaintiff did not mislead the defendant so that defendant can rely on any estoppel theories. Defendant was as conscious as plaintiff of the fact that the renegotiation proceedings were governed by a statute of limitations, which expired on June 30, 1973. Moreover, plaintiff's June 15, 1972, letter specifically reminded the Board that the time for completion of the proceedings had been extended only until June 30, 1973. The Renegotiation Board's failure to execute the necessary extensions demands that plaintiff's liability be discharged. This is perhaps a harsh result, but one that is clearly required by the statute and intended by Congress in enacting the limitations provisions. Statutes of limitations have been enforced in many areas as a necessary instrument of judicial machinery, designed to encourage the speedy resolution of potentially time consuming cases.

While no criticism of the Government's able counsel is intended, for they must do the best they can, in an adversary context, with the cases they are given to defend, still some wry amusement may be derived from a comparison of defendant's litigation position herein with that which obtains when, e. g., it is a question of the 30 day clause governing appeals by contractors from adverse contracting officer's decisions on contract claims. *See, Monroe M. Tapper & Assoc. v. United States,* 514 F.2d 1003, 206 Ct.Cl. 446 (1975); *Maney Aircraft Parts Inc. v. United States,* 479 F.2d 1350, 202 Ct.Cl.

54 (1973), and previous decisions in the same cases. Defendant's enthusiasm for the role of the 30 day clause in forfeiting otherwise viable claims, and its repugnance to making exceptions in deserving cases, by exercise of a judge-created power of discretionary waiver of the bar, stand in stark contrast with its eager invocation herein of estoppel and other equitable concepts, to save its own claim from a similar forfeiture. We may notice the inconsistency of defendant's litigation positions, even if its own counsel do not.

The Board has not issued an agreement or order determining plaintiff's liability for excessive profits within the prescribed statute of limitations period. Therefore, plaintiff's liability for excessive profits for fiscal year 1957 is discharged. We grant plaintiff's motion for summary judgment on Count 1 of its petition and determine that the plaintiff's obligation to eliminate excessive profits received or accrued in its 1957 year has been discharged.