**SOLITRON DEVICES, INC.**

v.

**The UNITED STATES.**

No. 133–75.

United States Court of Claims.

June 16, 1976.

418

Seymour Glanzer, Washington, D. C., attorney of record for plaintiff. Dickstein, Shapiro & Morin, Washington D. C., of counsel.

Marvin L. Coan, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant. John H. Broadley, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

NICHOLS, Judge.

We have before us another variation on the theme of the rich but impecunious government contractor who has realized and should refund excessive profits, at least according to orders of the Renegotiation Board, but who cannot stay enforcement of the orders because of inability to obtain a bond. It is one of the paradoxes of our time. We convened an *en banc* court to consider the case because of the possibility we might be obliged to overrule or modify our decision in *Sandnes' Sons, Inc. v. United States*, 462 F.2d 1388, 199 Ct.Cl. 107 (1972). However, we find no occasion to do so. The

list of cases involving the same problem also includes *O'Brien Gear & Machine Co. v. United States*, 199 Ct.Cl. 1014 (1972); *Bannercraft Clothing Co. v. United States*, 207 Ct.Cl. 199, 518 F.2d 605 (1975); *Manufacturers Service Co. v. United States*, 207 Ct.Cl. 185, 518 F.2d 1202 (1975). This is the first case since *Sandnes'* in which the working of the statute, as constructed in *Sandnes'*, is asserted to violate the Constitution.

Solitron Devices, Inc. (Solitron) is a publicly held company. Its securities are traded on the American Stock Exchange. It is a New York corporation with a principal place of business in Tappan, New York. It is in the electronics business and has several manufacturing facilities, both in this country and abroad. General R. F. Fittings, Inc., was a wholly owned subsidiary but in 1971 became a division of Solitron, and is included in any reference to the parent unless the context indicates otherwise. Solitron, so far as the instant case is concerned was engaged in the manufacture of electronic components such as rectifiers, transistors and diodes. Part of this was defense business, subject to the Renegotiation Act of 1951, as amended, 50 U.S.C. App. Sec. 1211, et seq. (Act), but the correct allocation of sales and costs to such business is in dispute. Solitron does not deny that some at least of its contract and purchase orders carried the notice prescribed in 50 U.S.C. App. Sec. 1214. It does assert that if the Act were correctly construed and applied to its business, it would not be found to have realized any excessive profits as defined in the Act. This, however, involves accounting questions, and matters of judgment, and must be put before our Trial Division on the merits of the case.

The Renegotiation Board commenced renegotiation with respect to Solitron's fiscal years ended February 28, 1967, February 29, 1968 and February 28, 1969 and 1970 (four years) and by orders dated January 24, 1975, determined that Solitron realized excessive profits of $491,112, $1,283,413, $483,451 and $1,460,783 respectively. A separate order assessed General R. F. Fittings for $150,000 for a short year. September 1, 1968 to February 28, 1969. These figures are large reduction from those the Regional Board originally had recommended, so it would appear Solitron was at one time menaced with exactions that greatly exceeded the orders now before us. The figures allow for state taxes but are before adjustment for Federal income taxes.

Solitron has filed its statutory position in this court to obtain our redetermination of its excessive profits, under the Act Sec. 1218, as amended, alleging it realized no excessive profits. But it has not filed the bond to stay execution of the Board orders. It says it cannot obtain one, or if it could, it would only be by furnishing such collateral that it would be unable to continue business. Defendant has, according to its usual practice, counterclaimed for the amounts of the orders. It has collected a little of them but relatively not much, by other collection measures the Act authorizes. The motion before us now is for judgment in aid of execution. If recovery is had on such a judgment, according to our decision in *Sandnes', supra*, it will not prevent Solitron from continuing to prosecute its litigation here, and if successful, it could of course recover with interest refunds to the extent necessary to effectuate our redetermination.

Solitron realized a renegotiable loss of $4,200,000 in its fiscal 1971, which could not be carried back to the renegotiated years. It paid dividends until the end of its fiscal 1973 year. Its 1971, 1972 and 1973 dividends distributed over $1,000,000. It has repurchased its own debentures. It has invested in real estate. Its working capital February 28, 1975, was $3,761,000 but cash was only $474,000. In Barron's of March 29, 1976, we find its stock listed at 4¼ high, 3⅜ low. We have not attempted to analyze the financial statement furnished in detail.

It seems clear that renegotiation must have been visible as a cloud on the horizon in fiscal 1967, when the first statutory notices started coming in, and the cloud must have grown steadily thereafter. Renegotia-

tion was commenced within two years after the close of each fiscal year. It does not seem that provision was ever made to assure ability to pay renegotiation refunds, if and when determined to be due. Counsel's explanation of this obvious fact is that the company never did believe, and does not now believe, that anything was due. Management clearly must have been aware, a long time before the orders of January 24, 1975, that first the Board staff, then the Regional Board, then the top Board, were of the opinion that something was due. The financial statement (which plaintiff furnished in support of its response) reflects that plaintiff's management is or has been in difficulty with the SEC, and has been sued by investors, because of alleged failure by management to publicize the severity of their renegotiation problems.

Because of economic conditions it may have now come about that bonds to stay renegotiation collection are obtainable only by companies that could pay the proposed refund in cash without inconvenience. And it is clear also that the impact of renegotiation includes not only companies that chose not to prepare for the day of renegotiation reckoning, but also companies that, e. g., by losses in years not under review, never had the ability to pay the refund that appears fair and just from scrutiny of a profitable. year or years only.

█ Counsel have reargued the statutory scheme and we adhere to our exposition of it, that the whole court was agreed on in *Sandnes'*. In brief, by Sec. 1215(b)(1) of the Act, upon the entry of an order the Board may authorize the Service Secretaries to collect by withholding techniques on current payments. Or by Sec. 1215(b)(3) actions may be brought in "the appropriate courts of the United States" to recover from the contractor or persons directed to withhold from him. By Sec. 1218 an entirely different action was authorized to redetermine the excessive profits *de novo*, originally in the Tax Court, now in this. And in that section it is provided that the petition for redetermination stays collection *only* if a bond is timely filed. Thus before we

were brought into the picture by Act of July 1, 1971, Pub.L. 92–41, there were two entirely different court procedures in absence of a bond: to collect, in the District Court, plainly barred from redetermining or reviewing the refund determination itself, as held many times, and to redetermine, in the Tax Court, which had nothing to do with collection except as filing a bond there might stay it. Now that we are the redetermining court, the collection proceeding, in the absence of a bond is a counterclaim which is compulsory here. *See also Manufacturers Service Co., supra.*

█ Plaintiff notes the stay provision in Sec. 1218 which cross references to Sec. 1215(b) and the "execution of the order of the Board" as the thing stayed. It argues that this means the Sec. 1215(b)(1) withholding procedure. However, suit under Sec. (b)(3) is also "execution" under Sec. 1215(b) and that such suits are "execution" is also shown by the fact that parties ordered to withhold from the contractor under Sec. 1215(b)(1) may also be sued. Plaintiff would reach an absurd result with the effect of the bond apparently being only to stay collection by means other than suits and not to stay suits. The effect of the bond clearly is to stay collection by any means, and by an obvious negative pregnant, with no bond, collection by any available means, including suits but not limited to suits, is not stayed.

Plaintiff then turns to its Constitutional argument. Insisting that in reality it owes nothing, it says we cannot constitutionally enter judgment according to the statutory scheme without some kind of due process preliminary hearing, since there was avowedly none at the Board level. The right to recover a refund after trial, if the findings establish entitlement, it says is not enough. Plaintiff is vague about what kind of preliminary court survey of the case would be sufficient. As a practical matter, in view of the judgmental nature of renegotiation, we think none would. Plaintiff is doubtless really demanding that there should be no collection at all until the

processes of this court have been traversed in their entirety and presumably, until the Supreme Court has denied *certiorari.* The administrative process of determining excessive profits is not a speedy one, as this case illustrates. So far the judicial process has, alas, not been particularly speedy either. If plaintiff is right, no one would ever eliminate excessive profits by agreement. By just refusing to agree, and petitioning to this court, he could probably retain control and use of the alleged excessive profits for nearer two decades than one. If Congress believed that the option to file a bond had become wholly illusory, except for those who could pay without hardship, it might well not vote for plaintiff's procedure. Under the 1943 Act, as we pointed out in *Sandnes', supra,* there was no provision for stay of collection after a final order, by bond or otherwise.

In *Sandnes',* too, the plaintiff would have had us hold that the procedure we thought the statute required was unconstitutional as to any contractor who was unable to file a bond. A fair reading of our majority and dissenting opinions will show all thought the scheme was not facially unconstitutional. The majority thought it might be unconstitutional as applied to a few exceptional Catch-22 situations, where it might lead to a petitioner being effectively "chilled" in his appeal to this court, without ever having had a due process hearing. The majority wanted to be shown that the contractor had got into its predicament without its own fault or negligence, and further, that the Government would or at least could use the judgment in a manner to prevent further prosecution of the petition in this court. The showing never was made in *Sandnes',* as the contractor never went before the Trial Division to make it, and this might have been anticipated, for the opportunity to make such a showing was not what it had sought. Three judges in dissent would have entered the requested judgment without further ado, not believing the statutory scheme could be unconstitutional as to any state of facts, or at least any suggested by the record before us.

■ Should we be satisfied to follow *Sandnes'* as a precedent, we would have to consider the matters we wanted to know more about in *Sandnes'.* Here we know enough to make reference to the Trial Division unnecessary. It is quite apparent that management had nine years, almost, from the time the statutory notices started coming in until the final orders, to commence making preparations for the evil day to come. However unjust they thought the demand would be, prudent management would have suggested some hedge against it. Management must prepare for the unjust as well as the just exaction. If the notices are not to warn the contractor to prepare for the blow of a Board order, it is difficult to see what purpose Congress meant them to serve. Solitron didn't even stop paying dividends until after 1973. They turned over profits many times exceeding the sums now demanded. Assuming they are now unable to obtain a bond, this would be irrelevant if they could pay the refund and continue in business. They could do this if they had taken the most obvious precautions. They are not, therefore, in the predicament they are in without their own fault or negligence, as at least a contributing cause according to their own showing here.

In *Sandnes'* we directed an inquiry (199 Ct.Cl. at 117, 462 F.2d at 1394):

b. Whether plaintiff's financial condition is due in any part to dividends or other distributions made from the notice of commencement of renegotiation, to now.

In *Sandnes'* the contractor was in bankruptcy. In view of this we were also uncertain what if any effect the judgment would have, surmising that like the Board order, it would simply be an item to be proved in the bankruptcy. We directed inquiry as to that point. Plaintiff here is not in bankruptcy and the possibility that our judgment could be used in a destructive way therefore has more plausibility. Plaintiff is not insolvent but we accept at least *arguendo* that if defendant had the judgment it could, if it so willed, put plaintiff in a situation of

stringency for cash and working capital, and might make it unable to meet other current liabilities. It would be imprudent for the Government to do so, no doubt, as killing the golden goose, but this does not guarantee it will not do it. It would seem however, if Government really attempted at whatever cost to itself as well as to the contractor, to collect on a liability that our ultimate decision on the merits may wash out entirely, a receivership would be a good defense. Plaintiff's not being in bankruptcy or receivership means its management, so long as this state continues, could dispose of assets while the case was pending here, a factor not present in Sandnes'.

Assuming as the majority did in Sandnes', that the statutory scheme may be unconstitutional as it might be applied in a few situations where the judgment in aid of execution would have an exceptionally harsh impact and would "chill" further prosecution of the case on the merits, before any due process hearing thereon, we do not see this as such a case. In some respects, as pointed out, the situation in Sandnes' was more suited to give us pause, and to justify a pause for further inquiry. To avert the judgment, therefore, plaintiff must persuade us, contrary to the view of the entire court in Sandnes', that the statutory scheme is facially unconstitutional or at least unconstitutional as applied to every contractor who cannot furnish a bond to stay execution of the Board order. This is Solitron's backup position. It expects us to overrule Sandnes' on the basis of changes in the "legal climate", i. e., the atmosphere emanating from Supreme Court decisions dealing with "collect now, litigate later" techniques, handed down since the date of Sandnes', July 14, 1972.

Commissioner v. Shapiro, 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278, was decided March 8, 1976, and of course was much discussed in oral argument before us. It shows that "collect now, litigate later" has its limits even in the generally open field of Internal Revenue enforcement. Defendant had assessed taxes on Shapiro and served levies upon various banks in which he had accounts or safe deposit boxes. He was about to be extradited to Israel to be tried for fraud there, and relied on the seized funds to finance his defense and for bail money there. He had a suit pending in the Tax Court which had not been decided. The damage from the seizures would obviously not be repaired by ultimate victory in the Tax Court. The question was whether the Anti-Injunction Act, IRC Sec. 7421(a) barred Shapiro's injunction suit, with the IRS merely asserting there was a tax liability, or whether some inquiry had to be made as to its factual basis. The Government would have required Shapiro to prove there was no factual basis for the tax, not informing him what facts it had. The Court affirmed the D.C. Circuit, holding for Shapiro. The Court said that to allow the Government to seize and hold property merely on a good-faith allegation that a tax was due, would raise serious Constitutional problems when, as in Shapiro's case, the seizure would cause irreparable injury. At 629, 96 S.Ct. at 1072.

These statements are supported by a footnote 11, citing Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); and Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), of which we had the benefit in our Sandnes' decision, and North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), which has come down since. This latter case holds a Georgia garnishment statute unconstitutional because a writ tying up a banking account may be had at the outset of litigation just by filing a conclusory affidavit and a bond with a clerk of court or other non-judicial officer. The footnote, however, distinguishes Regional Rail Reorganization Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), where it was held that no probable cause hearing is required where complainant will eventually be made whole for any inadequacy in compensation for confiscated property.

North Georgia Finishing, Inc., supra, likewise distinguishes Mitchell v. W. T. Grant

*Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), where a "sequestration" statute passed constitutional muster because there the seller-creditor holding a vendor's lien could obtain the writ only from a judge who had to be satisfied by an affidavit setting forth the facts, beyond mere conclusory allegations. There is much debate among the Justices, which need not concern us here, whether *Mitchell v. W. T. Grant Co.,* overrules *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and is in turn overruled by *North Georgia Finishing, Inc., supra.*

Defendant relies on two other recent Supreme Court tax cases interpreting the Anti-Injunction Act, IRC Sec. 7421(a), that go unmentioned in *Shapiro,* but assuredly are not to be regarded as overruled *sub silentio.* In *Bob Jones University v. Simon,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), that Act was held to bar a suit to enjoin the IRS from removing plaintiff from the list of tax-exempt private schools. It was asserted that this would cause donors to stop contributing for fear of losing their own tax deductions, an irreparable injury that ultimate victory in the school's own tax litigation would not repair. It was held that the school could not maintain the suit because it could not bring the case within *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), *i. e.,* it could not show the Government could under no circumstances prevail. *Commissioner v. "Americans United" Inc.,* 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974), followed immediately after *Bob Jones* and involves similar issues. The Court says expressly that irreparable injury does not suffice to bring a case within the *Enochs v. Williams Packing & Navigation Co.,* exception, 416 U.S. at 762, 82 S.Ct. 1125. We read these cases, with *Shapiro,* as restricting any judge-made exceptions to the Anti-Injunction Act to narrow situations of infrequent occurrence. Here, of course, we have no Anti-Injunction Act and we have legislation of some but not major impact upon the Revenue. The total inability to prevail standard would be difficult to engraft on a Renegotiation case,

when so much depends on individual judgment. Of course, any issue, whether a contractor is exempt or otherwise not subject to Renegotiation at all, can here be litigated by summary judgment at the outset of the case, as was done in *Newport News Shipbuilding & Dry Dock Co. v. United States,* 208 Ct.Cl. ——, 527 F.2d 1213 (1975), wherein the contractor got a summary judgment exonerating it from Renegotiation liability for the year involved, on showing that the Board had inadvertently allowed statutory limitations to run before the date of its Order.

■ It seems fair to say from the recent cases that the indigence of the debtor, and the fact that the contract to be enforced was one of adhesion, have lost some of the importance we assigned to them in our *Sandnes'* discussion. On the other hand, there is no more reason than before to believe that the due process requirements engrafted on the legal remedies of private creditors will be transferred entire to the extraordinary remedies granted the Government in the enforcement of its Revenue Acts and other important monetary legislation. We think an Act is facially constitutional, if it is in that class and if it authorizes a temporary deprivation of property without a hearing, but permits the ultimate making whole of the debtor in case he prevails in the due process hearing ultimately provided. Any exception must be in the instance of some extraordinary hardship as in *Shapiro's* case, irreparable because victory in an ultimate trial manifestly would not make him whole. This is nearly the formula the majority had in mind in the *Sandnes'* case.

■ We do not wish to be understood, however, as holding that our judgment here will have no better foundation than the garnishment process in Georgia. The Board's orders are at least more than a private creditor's *ipse dixit,* considering the Board's statutory independence (50 U.S.C. App. Sec. 1217), the elaborate procedure it follows according to law and regulations, and its internal appeals, here very success-

ful for the contractor. The order may not have been arrived at by due process in the traditional sense, but contractor was afforded the process which was due in the circumstances, including the availability of a full trial later on. *Cf. Flute v. United States,* Ct.Cl., 535 F.2d 624 (decided May 12, 1976).

We can and have read the Board's opinions attached to the petition, and see that they are at least facially reasonable, not bearing the indicia of bias and prejudice, nor appearing the work product of a kangaroo court. Plaintiff asserts bad faith in refusing to consider a Price Waterhouse audit submitted late in the case. The Board explains its position as to this. Whether the audit is decisive for plaintiff of course remains to be determined.

Plaintiff asserts that our function in entering the judgment in aid of execution is ministerial, unworthy of an Article III court. It was performed by District Courts before Pub.L. 92–41, *supra,* albeit with some grumbling. We have necessarily taken the case under our scrutiny to the extent indicated. On the whole, we think our pre-execution judicial scrutiny of the case will stand comparison with that under the Louisiana "sequestration" law, upheld in *Mitchell v. W. T. Grant Co., supra.*

Thus we think the basis for departing from the statutory procedure on constitutional due process grounds clearly exists only, if at all, when enforcement of that procedure, as written, threatens a contractor with substantial injury which would not be reparable by the final judgment obtained after trial on the merits. Albeit dictum, here we will say now that *Shapiro* teaches us not to view such instances lightly when their existence is shown. This is not such a case. We are not dealing with the installment buyer of a TV set he cannot afford. We are dealing with a publicly held company, considered responsible enough to be awarded millions worth of defense contracts over many years. Though the long time consumed by the cases before the Board is apparently not unusual, we doubt if Congress contemplated that a contractor would be able to retain alleged excessive profits, interest free, as long as this one has. In the long time taken and given the size, volume, and profitability of the business, it should have been easily possible to prepare for the blow. If plaintiff is in the plight it asserts it is, its own management is largely responsible. Considering the options open to both Government and contractor, the possibility of irreparable injury is not a clear and present danger, as in *Shapiro's* case, but remote and speculative at the worst. Plaintiff may be concerned how the judgment will be received by the SEC and by its investor plaintiffs, but they all can read this opinion and see there is not a final judgment here on the merits. If collection from plaintiff is effected, it may recover everything on final judgment, with interest as provided by law. There is no clear and convincing demonstration that this will not make it whole.

Accordingly, defendant's motion for judgment in aid of execution is granted. The tax credit computations furnished by the Internal Revenue Service must be used. If they are wrong, this can be corrected in the final judgment. Judgment is entered for defendant in the following amounts with interest as provided by law:

Fiscal Year:

| | |
|---|---|
| 1967 | $491,112.00 |
| 1968 | 1,283,413.00 |
| 1969 | 483,451.00 |
| 1970 | 1,460,783.00 |
| For General R. F. Fittings | 150,000.00 |

Less tax credits as follows:

Fiscal Year:

| | |
|---|---|
| 1967 | $235,733.76 |
| 1968 | None |
| 1969 | None |
| 1970 | Not known: Defendant stipulates maximum possible, 48%. |
| For General R. F. Fittings | None |

Net after tax credit:

Fiscal Year:

| | |
|---|---|
| 1967 | $255,378.24 |
| 1968 | 1,283,413.00 |
| 1969 | 483,451.00 |
| 1970 | 759,607.16 |
| For General R. F. Fittings | 150,000.00 |

BENNETT, Judge, joined by KUNZIG, Judge (concurring):

I concur in the result and in the court's opinion so far as it goes, but feel it necessary to add a few words because the majority opinion does not squarely address one of the two constitutional defenses asserted by plaintiff to defendant's motion for summary judgment in aid of execution of the orders of the Renegotiation Board entered against plaintiff.

Plaintiff correctly observes that the U.S. Court of Claims is a court created under article III of the Constitution. *Glidden Co. v. Zdanok,* 370 U.S. 530, 571–84, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). Plaintiff then refers us to article III, section 2, of the Constitution. Section 2 provides that the federal judicial power extends to all "cases and controversies" to which the United States shall be a party. But, plaintiff says that pre-hearing entry of a money judgment by this court based not upon facts and evidence, but solely upon the board's orders, would not be an act of a sufficiently judicial nature to be performed by an article III court. In other words, such a judgment would be *void* since not produced by an exercise of the judicial power of the United States. Plaintiff views the renegotiation statute as attempting to vest in the judiciary jurisdiction over matters which are purely legislative or administrative in their substance when in section 108 it would authorize issuance of pre-redetermination "judgments" in aid of execution of administrative orders. Plaintiff says that this is just not adjudication by the court of a justiciable controversy. This particular question has not heretofore been squarely addressed in a majority opinion of this court in renegotiation cases. I think we must now speak to it. Of course, it is not contested that legislative or administrative jurisdiction cannot be conferred upon article III courts. To do so would violate the doctrine of the separation of powers. The question now is whether or not that is what Congress had done here.

Plaintiff asserts that for us to enter a $2.9 million judgment against it without evidence upon which we can exercise the judicial power of the United States, indeed lacking even an administrative record, and in face of the policy of the Renegotiation Act that no presumptive validity attaches to the unilateral declarations of the Renegotiation Board, simply makes the court a rubber stamp for the board and transforms the court into an extension of the administrative processes of the executive branch. Alternatively, plaintiff suggests that if section 108 of the Act requires this court to enter a judgment on behalf of defendant in such a factual void, that section should be held to be unconstitutional "as it is patently antithetical to the concept of justiciability embodied in Article III of the Constitution." On justiciability generally, see *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Plaintiff's constitutional arguments are serious and two-fold. First, that to go along with defendant's demand for judgment because plaintiff has not posted the required bond would be premature and deny plaintiff due process if there is no hearing on that issue, or indeed upon all the issues presented by the pleadings. The court's opinion deals adequately with plaintiff's due process issue as it pertains to a demand for hearing before judgment in aid of execution of the board's orders. The second issue, however, which the opinion does not address, is whether the judicial power of the United States attaches at all in the present posture of the case.

We have here a peculiar statute that requires a contractor "to pay now and litigate later." But, it does provide plaintiff with the opportunity, in a de novo hearing at a later date, to show, on the merits, that the board determination was wrong and to recapture, with interest, any sums wrongly found by the board to have been excessive profits. It is in the present initial stage of the case that we have this ancillary proceeding with reference to stay of execution. As defendant suggests, this is the time for the court to inquire into whether the board's orders were entered against the proper party, whether the procedures fol-

lowed in entering the board orders were lawful, whether plaintiff has paid the amount claimed by the board to be due, whether it has in fact posted the required bond to stay execution, and whether the entry of a judgment now would have a chilling effect on plaintiff's ability to litigate the de novo redetermination. The court has no problems with these factors in this case. It adheres to its prior holdings that section 108 requires the posting of a bond as a condition for stay of the orders of the Renegotiation Board and that the court is required and directed to grant a judgment in aid of execution based on those orders when no proper bond is filed without excusable cause.

As to the jurisdictional issue, this proceeding involves a justiciable case or controversy to the extent it seeks, and defendant opposes a judicial determination of the ultimate issue of excessiveness. The ancillary or collateral relief now being sought—judgment in aid of execution of the board's orders—could not be awarded in the absence of plaintiff's own petition for redetermination. We would have no jurisdiction absent an affirmative claim for relief. In other words, plaintiff brought us a case or controversy when it filed its petition. We do not decide the merits thereof at this stage, but under the statute must go forward as it directs without prejudice to plaintiff's right and opportunity to prove to us that the board was wrong and that its profits were not excessive. The judicial power has been invoked. Yes, it is hard to have to put up the money first and litigate later. But, this statutory scheme was on the books when plaintiff took the contract with notice of it. By entering renegotiable business and by failing to provide the bond the statute requires, plaintiff, in my view, has waived the right to any hearing on the merits of the excessiveness issue prior to execution of the board's orders. Also, the Supreme Court has sanctioned the constitutionality of the pay now, litigate later scheme in upholding unilateral revenue determinations similar to the scheme in the Renegotiation Act, where adequate opportunity is afforded for a later judicial deter-

mination of the legal rights. *Phillips v. Commissioner,* 283 U.S. 589, 593–95, 51 S.Ct. 608, 75 L.Ed. 1289 (1931). Of course, there is room for argument that the basic purpose of the Renegotiation Act is not to gather revenue, if that makes any difference, which I think not. *Sandnes' Sons, Inc. v. United States,* 199 Ct.Cl. 107, 462 F.2d 1388 (1972). But, plaintiff cannot complain when it has not convinced the court that it cannot put up the bond to stay execution. *Cooper-MacDonald, Inc. v. United States,* Ct.Cl. No. 88–75, 207 Ct.Cl. 1036 (Order, Oct. 3, 1975); *O'Brien Gear & Machine Co. v. United States,* 199 Ct.Cl. 1014 (1972). Hardship entailed by the bond requirement is insufficient excuse, without more, for noncompliance. Nor can it properly claim that we are not proceeding with a case or controversy under article III when it has given us just that which it now says is lacking, and we are only proceeding in an ancillary, collateral way without prejudice to the merits of plaintiff's principal claim.